FILED

2016 Apr-28  AM 09:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### (Southern Division)

| | |
|---|---|
| Marnika Lewis, Antoin Adams, )<br>Alabama State Conference of )<br>the National Association For the )<br>Advancement of Colored People, )<br>and Greater Birmingham Ministries, )<br>  )<br>     Plaintiffs, )<br>vs. )<br>  )<br>Robert J. Bentley, in his Official Capacity )<br>as Governor of the State of Alabama; )<br>and Luther J. Strange, III, in his Official )<br>Capacity as Attorney General of )<br>the State of Alabama; )<br>  )<br>     Defendants. ) | CIVIL ACTION NO. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Come now the Plaintiffs, by and through counsel and complain against the Defendants, as follows:

## INTRODUCTION

1.     In August, 2015, the City Council of Birmingham and itsits Mayor decided, on the basis of the economic and social welfare interests of the City's residents, to increase the minimum wage above the federally mandated minimum of $7.25 per hour for employees employed by employers within the City.  City Council President Johnathan Austin stated when the ordinance was first passed in August of 2015, "We're just trying to do what we think is best

for our citizens and our workers".[1] And as city councilor LaShunda Scales said, "We can't have a progressive city and low wage jobs."[2]

2.      The passage of the Birmingham minimum wage ordinance, which would have raised the minimum wage to $10.10 per hour, was a move by the elected officials of the City in the interest of Birmingham's predominately African-American workforce to lift them out of poverty.

3.      The City of Birmingham, Alabama is the largest municipality in the state, with a population that is approximately 74% African-American.  Approximately 32% of its African-American residents have earnings below the federal poverty level. African-American residents' per capita income averages under $16,000 per year.  All those with earnings below the poverty level, as well as others, would have benefited by implementation of the minimum wage ordinance.

4.      Deliberately unresponsive and openly hostile to the economic needs of minorities, several white legislators proposed a bill nullifying Birmingham's minimum wage ordinance during a special session in 2015.  Because of the limits on a special session, the Legislature did not act upon the proposed legislation.  However, the first order of business in the new session was to revoke and nullify Birmingham's minimum wage ordinance.  The passage of a statute abrogating Birmingham's "minimum wage" ordinance is the most recent example of the State Legislature denying a predominantly African-American local government and its residents of the right to determine what is best for their community.

---

[1] AL.com, Birmingham City Council Votes to Raise Minimum Wage, http://www.al.com/news/birmingham/index.ssf/2015/08/birmingham_minimum_wage_increa.html, August 18, 2015.
[2] *Id.*

5.      In its haste to override Birmingham's minimum wage ordinance, the Legislature disregarded even the very limited procedural protections that existed against State intrusion into local affairs.   In uncharacteristic fashion, and contrary to its normal practices, the State Legislature passed the so-called "Alabama Uniform Minimum Wage and Right To Work Act" (hereinafter "HB 174") in a little over a week after its first reading and the Governor signed the bill within two hours after it reached his desk.[3]

6.      The Plaintiffs bring this action to remedy current harms arising from the denial of equal protection under the law.   The enactment of HB 174 (a sweeping statute nullifying Birmingham's minimum wage ordinance and pre-empting any local regulation of matters touching upon private sector employment) is the most recent chapter in a long history of the Alabama State Legislature discriminating against predominantly African-American communities; a history that traces its origins to the 1901 Constitution.   Though the Voting Rights Act enabled African-American communities to elect at the local level representatives of their choosing, this ability to elect has not resulted in policies responsive to the needs of these communities.

7.      The Plaintiffs' Complaint asserts claims under the Fourteenth Amendment's equal protection clause.   The Plaintiffs complain that the State Legislature's decision to nullify Birmingham's minimum wage ordinance was racially motivated and that this legislation disproportionately impacts African-American residents of Birmingham who work in the city. Second, the Plaintiffs complain that the State Legislature's nullification of Birmingham's minimum wage ordinance and pre-emption of any local ordinance or regulation related to private sector employment relies on the 1901 Constitution's concentration of power at the State level

---

[3] Westlaw provisionally cites HB 174 as Ala. Code § 41-30-1.

and its denial of local autonomy (i.e. home rule). The delegates who drafted and voted for the 1901 Constitution concentrated power at the State level for the express purpose of denying predominantly African-American communities local control over matters affecting these communities. They did so expressly upon racial grounds. Finally, the pre-emption of any and all ordinances or regulations related to private sector employment uniquely burdens predominantly African-American communities. As a result of HB 174, African-Americans must now petition the State Legislature for any legislation related to private sector employment, even if the proposed legislation would only affect employment within their city. The State's Legislature removal of the entire area of private sector employment from the reach of local government is precisely the type of burden that the drafters of the 1901 Constitution imposed on predominantly African-American communities. Moreover, HB 174's sweeping preemption clause creates a vacuum because it does not substitute Birmingham's ordinance with a state law, a fact which indicates that the intent of the Legislature was to alter the political process and maintain control over predominantly African-American communities interested in passing minimum employment standards.

## PARTIES

8.     The Plaintiff Marnika Lewis is twenty-three years old and a resident of the City of Birmingham. Ms. Lewis is African-American and a single mother of a five year old son. She is currently employed at Moe's Restaurant on 5th Avenue South in Birmingham. She has been employed at Moe's for approximately three years. She earns $7.75 per hour and since beginning work at Moe's she has received one 25-cent per hour raise about one and a half years ago. Ms. Lewis makes approximately $270 per week and her annual income is less than $14,000. Despite working close to a full-time schedule, Ms. Lewis cannot afford her basic needs without public

assistance. She receives Supplemental Nutrition Assistance Program ("SNAP") benefits to cover food costs.  Ms. Lewis relies on Jefferson County Committee for Economic Opportunity's ("JCCEO") energy assistance program to heat her home.  Ms. Lewis does not receive any health benefits from Moe's and depends on the University of Alabama-Birmingham's low-income clinics for her family's healthcare needs.  She cannot afford the cost of childcare.  Instead Ms. Lewis is forced to rely on a network of friends and family to care for her son when she is at work.  This ad hoc system often leaves her son without a caregiver. The raise in the minimum wage by the city of Birmingham would have helped Ms. Lewis afford daycare for her son and provide additional income to allow her to return to school.

9.      The Plaintiff, Antoin Adams is an African American,  twenty-three years old and a resident of the City of Birmingham.  Mr. Adams has been employed at Hardees at 5113 Airport Highway in Birmingham, AL for approximately four months.  He earns $7.25 per hour and his annual income is less than $10,556.  Prior to working at Hardee's, Mr. Adams worked at Wal-Mart.  He receives no health benefits and must pay for medical treatment out-of-pocket. Mr. Adams suffers from chronic asthma and must regularly go to the hospital for breathing treatments.  He is unable to afford his basic living expenses without government assistance.  Mr. Adams received SNAP benefits until last month and he currently lives in Section 8 housing. The raise in the minimum wage by the city of Birmingham would have helped Mr. Adams afford food and household items. It would also allow him to save for college. Mr. Adams wants to become a computer technician but cannot afford to attend college on his current salary.

10.     Organizational Plaintiff Alabama State Conference of the National Association for the Advancement of Colored People ("the Alabama NAACP") is a state subsidiary of the National Association for the Advancement of Colored People, Inc. The Alabama NAACP is the

oldest and one of the most significant civil rights organizations in Alabama, and it works to ensure the political, educational, social, and economic equality of African Americans and all other Americans.  Eliminating the racial wage gap is a key focus of the Alabama NAACP. To that end, it advocates for a living wage in low paying industries where workers of color are disproportionately represented and especially concentrated.

The Alabama NAACP is composed of 48 branches across the state of Alabama, including the Metro Birmingham branch.  The Alabama NAACP has significant membership in the City of Birmingham and many of those members will be directly impacted and harmed by HB 174.

The Alabama NAACP has standing to challenge HB 174 on behalf of its members.  As a result of HB 174, a number of the Alabama NAACP's members were deprived of a living wage without constitutional notice.  HB 174 also distorted the political process for Alabama NAACP's members and denied them equal protection of the law.

11.     Organizational Plaintiff Greater Birmingham Ministries ("GBM") was founded in 1969 in response to the urgent human rights and justice needs of the residents of the greater Birmingham, Alabama area. GBM is a multi-faith, multi-racial organization that provides emergency services for people in need. It engages in community efforts to create systemic change with the goal of building a strong, supportive, and politically active society that pursues justice for all people.

12.     The Defendant Robert J. Bentley is the Governor of the State of Alabama and is charged with responsibility for upholding the Alabama Constitution and executing state law.  He approves and signs into law bills enacted by the legislature. He is named in his official capacity.

13.     The Defendant Luther J. Strange, III is the Attorney General for the State of Alabama and its chief legal officer.  He advises various state, county and city officials regarding

questions of law connected with the performance of their duties.  He is named in his official capacity.

14.     Defendants' actions in support of the pre-emption of Birmingham's minimum wage ordinance were taken under color of state law and in violation of 42 U.S.C. § 1983 and the equal protection clause of the Fourteenth Amendment to the United States Constitution.

## JURISDICTION

15.     This Court has jurisdiction over this matter pursuant to 42 U.S.C. §1983 and 28 U.S.C. § 1331 (federal question).

## STATEMENT OF FACTS

16.     On April 21, 2015, the Birmingham City Council unanimously passed a resolution asking the state Legislature to raise the minimum wage to $10 per hour across the state.  City Councilman, Jay Roberson, in speaking in favor of the resolution stated that "their advocacy on increasing the minimum wage to $10 an hour in Alabama is an economic issue that will benefit all, . . . I hope the city of Birmingham and the business community will respectfully adhere to this great economic boost for all hard working employees which hopefully will become law in the near future."[4]

17.     Almost simultaneously with the rally and the passage of the Birmingham City Council's resolution calling for an increase in the minimum wage, Representative Arnold Mooney (a white representative from the 43rd District-Shelby) introduced bill HB 495 in the Alabama Legislature.  HB 495 sought to prevent any municipality from requiring that employers provide wages, paid or unpaid leave, and/or vacation pay that is not required by federal or state

---

[4]Birmingham City Council Endorses Campaign to Raise Minimum Wage, http://www.al.com/news/birmingham/index.ssf/2015/04/birmingham_city_council_endors_1.html, April 21, 2015.

law.   HB 495 did not advance out of the Alabama House of Representatives and further consideration was postponed when the legislative session ended in early June 2015.

18.     On August 18, 2015, the Birmingham City Council unanimously passed, with one abstention, Ordinance 15-124 that would raise the minimum wage for employees working in the city to $8.50 per hour as of July 1, 2016 and $10.10 per hour on July 1, 2017.  The ordinance was published and went into effect on August 30, 2015.  (Ordinance 15-24 attached as Exhibit 1 hereto). The ordinance received wide spread approval among Birmingham's African-American residents, which comprise approximately seventy-three (73) percent of Birmingham's population.

19.     In reaction to the Birmingham City Council's ordinance increasing the minimum wage, on or about September 8, 2015, at the beginning of Alabama Legislature's second special legislative session of 2015, Alabama House District 47 Representative David Faulkner, (a white representative of the Birmingham suburb of Mountain Brook),[5] introduced bill HB 27 that prevents cities such as Birmingham from raising the minimum wage.  Faulkner stated that he was "shocked" that the city could raise the minimum wage for its residents.[6]  Birmingham was the only city or governmental entity in the state to have passed a minimum wage ordinance at the time of Senator Faulkner's introduction of HB 27.

20.     There was no public notice of the bill or an opportunity for hearing, and HB 27 did not advance through the Legislature during the second special session.

---

[5] According to recent United States census figures, Mountain Brook is approximately 98% white and its median income of approximately $130,000.00 is more than six times higher than that of Birmingham.
[6] Alabama Lawmakers Consider Bill to Block City Minimum Wages, http://www.al.com/news/index.ssf/2015/09/alabama_lawmakers_consider_bil.html, September 9, 2015.

21.     Undeterred by the lack of passage of HB 27, Representative Faulkner on February 9, 2016, the third day of the 2016 legislative session of the Alabama Legislature, introduced  HB 174 which combined Representative Mooney's HB 495 introduced in April of 2015 and Representative Faulkner's HB 27 introduced in September of 2015.  HB 174, referred to as the "Alabama Uniform Minimum Wage and Right-To-Work Act," (hereinafter HB 174 or the Act) sought to block and declare void Birmingham's minimum wage ordinance passed in August of 2015.  The fifty-three sponsors of HB 174 in the House (all of them white) squarely targeted Birmingham and its minimum wage ordinance as Birmingham was the only city or public entity in the state of Alabama that had raised its minimum wage above that required by federal law.  No Alabama law provides for a minimum wage, nor did the supporters of HB 174 include any state-wide minimum wage within its provisions. The leadership of the House of Representatives fast-tracked HB 174 in the House which held a short public hearing on the bill on February 11, 2016 and voted it out of the Committee on State Government by a vote of 10-3.  All ten supporters of the bill in the House Committee were white.

22.     On February 16, 2016, the House of Representatives approved the bill 71-31 and sent it to the Alabama Senate. All members of the House voting in favor of the bill were white; all twenty-seven African-American Representatives voted against the bill.

23.     While the State Legislature was acting to prevent implementation of the Birmingham minimum wage ordinance, on February 9, 2016, the Birmingham City Council adopted Ordinance 16-25 to make the minimum wage increase effective on March 1, 2016. Mayor William Bell signed Ordinance 16-25 on February 16, 2016 and it was published and became effective on February 19, 2016.  Accordingly, Ordinance 16-25 went into effect as of that date.  (City of Birmingham Ordinance 16-25 attached as Exhibit 2 hereto).

9

24.     On February 23, 2016, the Birmingham City Council adopted Ordinance 16-28 entitled "An Ordinance Relating to Minimum Wage to Be Paid to Employees by Employers in the City of Birmingham."  Among the reasons the City Council adopted Ordinance 16-28, like ordinances 15-124 and 16-25, was because "Poverty in the city of Birmingham is a problem that affects the general health and welfare of its citizens, it is incumbent upon the city to take legislative steps to help lift working families out of poverty, decrease income inequality, and boost our [Birmingham] economy."  (City of Birmingham Ordinance 16-28 attached as Exhibit 3 hereto).

25.     Ordinance 16-28 moved the effective date of the minimum wage increase to February 24, 2016 and increased the minimum wage to $10.10.  The City Council acted to move up the date of the minimum wage increase because the white supporters of HB 174 in the Alabama state Legislature were fast-tracking HB 174 in an attempt to have it pass before the first wage increase provided in Birmingham's August 18, 2015 Ordinance took effect.

26.     Birmingham Mayor William Bell signed Ordinance 16-28 on February 24, 2016. Publication of the ordinance in the Birmingham News was set for Sunday, February 28, 2016.

27.     The Alabama State Senate, led by Senator Jabo Waggoner (a white senator representing the Birmingham suburb of Vestavia Hills), fast-tracked HB 174 in approximately 36 hours through the Senate Committee on Governmental Affairs and the Senate passed the bill on a 23-12 roll call vote on February 25, 2016.  All Senators voting in favor were white; all six African-American members of the Senate voted against passage. The bill was delivered to Governor Robert Bentley on February 25 and it was signed by the Governor approximately ninety minutes after its passage in the Senate.

28.     One specific provision of this new law renders null and void any municipal or county minimum wage ordinance enacted prior to passage of HB 174.  This retroactive nullification of wage ordinances applied only to the City of Birmingham.  Section 110 of the Alabama Constitution provides, in relevant respects, that a general law affecting only one municipality at the time of enactment must comply with the notice provisions of Section 106.

29.     The notice provisions of Alabama Constitution Section 106 require, *inter alia*, that before a special, private or local law shall be passed, it must be published in the local newspaper for four consecutive weeks in the county or counties affected by the law.

30.     The Alabama House of Representatives and the State Senate failed and refused to provide the notice required by Section 106 of the Constitution in an effort to keep Ordinance 16-28 from becoming effective.

31.     The passage of HB 174 by the Alabama Legislature fits a historical pattern of legislation that discriminates against African Americans and thwarts the efforts of African-Americans in the state of Alabama who seek to improve their economic and social well-being. The enactment of HB 174 resulted in approximately 40,000 low wage workers in Birmingham being denied a wage increase.

32.     State Senator Slade Blackwell, (a white senator from the wealthy Birmingham suburb of Mountain Brook) stated in support of the legislation and in opposition to the Birmingham ordinance that increases in the minimum wage especially hurt young people from poorer families who may not have easy access to trendy internships at colleges and private companies to build their skill set and resume.  Since HB 174 was targeted only at Birmingham, which is predominately African-American and many of whose residents live below the poverty line, this statement by Senator Blackwell, was directed at the poor, African American residents

11

of the city of Birmingham.  This statement, and others by white legislators, invoked racial stereotyping to justify denial of a living wage to African-American residents of the city of Birmingham.

33.     In contrast to Birmingham's 32% of African-Americans living below the federal poverty level, only 2.57% of Mountain Brook's residents (97.2% white) lived below the federal poverty level.

34.      Just before the final vote, State Senator Bill Hightower, (a white businessman and real estate investor from Mobile), spoke in support of the bill saying "we should lower the minimum wage," and later posted on his Twitter account his claim that "raising the minimum wage hurts the poor."

35.     Sen. Dick Brewbaker, (a white senator from Montgomery) said he was concerned about the bill generally, and speculated that "Montgomery would probably follow suit," if Birmingham's wage ordinance was allowed to stand.

36.     Montgomery is approximately 57% African-American and after Birmingham, has the second highest concentration of African-Americans among Alabama's large cities.

### History of Alabama's 1901 Constitution and its Present day Effects

37.     By almost any measure, the 1901 Constitution with its retention of local control in the hands of the State Legislature is aberrational. With over 700 amendments, Alabama's 1901 Constitution is uniformly regarded as the longest State constitution in the United States, almost forty times longer than the United States Constitution. The length of the 1901 Constitution is a consequence of the limited home rule the Constitution affords to counties and municipal corporations, requiring the Legislature and the voters to adopt amendments dealing with local

affairs. More than 500 of the approximately 772 amendments to the 1901 Constitution pertain to a specific county or municipality.

38.     The delegates to the 1901 constitutional convention adopted a constitution that concentrates legislative power at the State level.  The convention's president John Knox openly acknowledged the racially discriminatory purpose animating the consolidation of power at the state level: "After the war, by force of Federal bayonets, the negro was placed in control of every branch of our Government. Inspired and aided by unscrupulous white men, he wasted money, created debts, increased taxes until it threatened to amount to confiscation of our property. While in power, and within a few years, he increased our State debt from a nominal figure to nearly thirty million dollars."  Referring to blacks as having the "lowest ... intelligence and moral preceptions [sic] of all the races," constitutional convention president John B. Knox confidently commenced the 1901 constitutional convention by proclaiming that "[t]here is in the white man an inherited capacity for government, which is wholly wanting in the negro."

39.     Convention reports of the 1901 constitutional convention establish that the convention delegates adopted and retained the home rule restrictions in part because of a desire to discriminate against the State's African-American population and to prevent African-American citizens from exercising control over local governments where they constituted a majority of the population. Indeed, the 1901 Constitution maintained and expanded home rule restrictions previously adopted in the 1875 Constitution.  The 1875 Constitution (referred to as the "Redeemer" Constitution) followed on the heels of an electoral victory by the Democratic Party in 1874.  The Democrats campaigned on a slogan of "white supremacy" and claimed to have "redeemed" Alabama from "black rule" and restored white supremacy by capturing the office of Governor and control of both houses of the Legislature in the 1874 state elections.

*Knight v. Alabama,* 787 F.Supp. 1030, 1070-71 (N.D. Ala. 1991), *aff 'd in part and rev 'd in part,* 14 F.3d 1534 (11th Cir. 1994).   Once in power, the Democrats convened a constitutional convention and adopted the so-called "1875 Redeemer Constitution" which severely restricted the power of local and state government.

40.     In *United States of America v. State of Alabama*, 252 F. Supp. 95 (M.D. Ala. 1966), the U.S Government challenged a poll tax provision contained in Alabama's Constitution. The provision had been added to Alabama's Constitution during the 1901 Convention.   A majority of the three judge panel considering this challenge found that racial discrimination motivated the inclusion of a poll tax provision.   Writing for the majority Judge Rives made the following finding: "The Journals of the Convention leave absolutely no doubt as to what the delegates of the white citizens of Alabama wished the Convention to accomplish:

> '* * * We want the white man who once voted in the state and controlled it to vote again. We want to see that old condition restored. Upon that theory we took the stump in Alabama having pledged ourselves to the white people upon the platform that we would not disfranchise a single white man if you trust us to frame an organic law for Alabama, but it is our purpose, it is our intention, and here is our registered vow to disfranchise every Negro in the state and not a single white man." 252 F. Supp. at 98.

41.     In rejecting the State's position that the discriminatory motives behind the original enactment of the 1901 Constitution could not be imputed to the State some sixty-five years after adoption, Judge Rives noted that "from the Constitutional Convention in 1901 to the present [i.e 1966], the State of Alabama has consistently devoted its official resources to maintaining white supremacy and a segregated society. Statutes, cases and the statements of its Governors demonstrate that the State's resistance to the rights of Negroes to equal treatment continued even after the Congress and the Supreme Court of the United States had expressly declared that the State's action was unconstitutional." 252 F. Supp. at 101.

14

42.     In *Dillard v. Crenshaw County*, (a Voting Rights Act challenging use of at-large districts), Judge Thompson observed that any doubt about the State's Legislature's motivation in adopting such election systems is dispelled by the undisputed fact that such "systems were created in the midst of the state's unrelenting historical agenda, spanning from the late 1800's to the 1980's, to keep its black citizens economically, socially, and politically downtrodden, from the cradle to the grave." 640 F. Supp. 1347, 1357 (M.D. Ala. 1986).

43.     Speaking directly about the 1901 Constitution, Judge Thompson made the following findings: "There can be little question but that a major purpose of the 1901 Convention was to disenfranchise black persons. As the Supreme Court recently commented in another case, expert testimony "showed that the Alabama Constitutional Convention of 1901 was part of a movement that swept the post-Reconstruction South to disenfranchise blacks. ... The delegates to the all-white convention were not secretive about their purpose." *Hunter v. Underwood,* 471 U.S. 222, 229, 105 S.Ct. 1916, 1920–21, 85 L.Ed.2d 222 (1985). The 1901 Constitution contained so many different voter qualifications that by 1909 all but approximately 4,000 of the nearly 182,000 black persons of voting age in Alabama had been removed from the rolls of eligible voters. *Bolden [v. City of Mobile],* 542 F.Supp. [1050] at 1063 & n. 10." 640 F. Supp. At 1358.

44.     By pre-empting Birmingham from enacting employment related ordinances that respond to the needs of the individual Plaintiffs and the African-American individuals the organizational Plaintiffs represent, the state of Alabama has deliberately burdened the ability of Plaintiffs to effectuate meaningful change aimed at eliminating the vestiges of *de jure* race discrimination. These vestiges include, but are not limited to, significant disparities in unemployment rates among racial groups, significant disparities in levels of income and wealth among racial groups, significant disparities in home ownership amount racial groups, significant

disparities in educational attainment and significant disparities in poverty rates among racial groups. *See generally*, Regina Moorer, <u>Inequality in Alabama: A County-Level Analysis</u> (2012). Given that African-American communities have no effective representation at the state wide level (e.g. there are no African American state wide elected officials) and the state Legislature is a product of racially polarized voting and racial gerrymandering, the Plaintiffs have no political recourse to address these vestiges of *de jure* discrimination at the state wide level.

45.     As a result of HB 174, the state of Alabama retroactively nullified the Plaintiffs' right to receive a minimum wage of $10.10.  In order to restore that right, the Plaintiffs now have to persuade the state Legislature to raise the minimum wage to $10.10 as opposed to persuading a local government.

46.     HB 174 also contains a provision designed to invoke the 1901 Constitution's restrictions on home rule.  Section 6(c) of the Act provides in relevant part that "the authority of a municipality to regulate . . . the wages, leave or other benefits provided by an employer to an employee, class of employees or independent contractor shall not be inferred from proprietary authority, home rule status or other inherent or general power."   Reliance on the 1901 Constitution's limitations and/or deprivation of home rule (e.g. Article IV, Section 44) to deny decision-making authority to the predominantly African-American community and to entrench racial disparities in income, among other things, taints the enactment of HB 174 with racial animus.

47.     The home rule restrictions embodied in the 1901 Constitution and Alabama case law, which the Legislature utilized to enact HB 174, have disparately impacted economic development opportunities in counties and municipalities that are predominantly African-American.   In addition to the racial disparities noted above, counties with majority white

populations have successfully secured authority from the Legislature to govern local affairs more often than African-American counties and the counties with majority white population have secured twice as many constitutional amendments granting local authority than predominantly African-American counties.

## COUNT I

**(1901 Constitution's Deprivation of Home Rule Violates the
Fourteenth Amendment's Equal Protection Clause)**

48.     The 1901 Constitution expressly and as interpreted by the Alabama Supreme Court grants municipalities very limited autonomy to legislate over matters directly affecting their residents.

49.     As noted above, the inclusion of restrictions on local government autonomy and the centralization of power at the State level in the 1901 Constitution was racially motivated.  It is well established that the delegates to the 1901 constitutional convention purposefully deprived local governments of any meaningful authority in order to discriminate against African-American citizens.

50.     Section 6 (a) of HB 174 expressly provides that the purpose of the Act is to establish within the Legislature complete control over regulation and policy pertaining to wages, leave or other employment benefits provided by an employer to an employee, class of employees or independent contractor.

51.     The State Legislature's exercise of "complete control" and its preemption of any local ordinance regulating wages, leave or other employment benefits can be traced to the 1901 Constitution's centralization of power at the State level and its intent to deprive predominantly

African-American communities of local autonomy on the basis of racially discriminatory motives.

52.     The State Legislature's exercise of "complete control" over regulation and policy pertaining to wages, leave or other employment benefits disproportionately impacts African American employees (like the Plaintiffs) who work and reside in the City of Birmingham.

53.     HB 174 violates the Fourteenth Amendment's equal protection guarantee because (a) the exercise of complete control over regulation and policy pertaining to wages, leave or other employment benefits can be directly traced to provisions in the racially discriminatory 1901 Constitution that deprives African-American citizens (through their locally-elected representatives) the right to regulate such matters of central concern to their daily lives; (b) such provisions that grant exclusive authority to the State Legislature to override any and all local ordinances are vestiges of race discrimination and (c) HB 174 disproportionately impacts African American residents who live and work in the City of Birmingham.

## COUNT II

### (Racially-Motivated Enactment of HB 174 Violates the Equal Protection Clause of the United States Constitution)

54.     The Plaintiffs incorporate by reference the factual allegations in the preceding paragraphs.

55.     Defendants' actions constitute intentional discrimination on the basis of race contrary to the Fourteenth Amendment.

56.     The persons denied the benefits of the Birmingham minimum wage legislation are predominantly African-American.  Approximately 32% of Birmingham's African-American residents had annual earnings below what they could have earned had the minimum wage

18

ordinance become effective.  The Alabama Legislature's enactment of H.B. 174 denies the City of Birmingham the opportunity to obtain the same economic opportunities for its residents as is presently available to predominantly white communities throughout Alabama.

57.     For example, the City of Mountain Brook, home of the sponsor of HB 174, with 97.2% of its residents white, has less than 3% of its residents with annual earnings below the federal poverty level.  Additional support for HB 174 came from Senator Waggoner, a white senator representing Vestavia Hills -- a city that is 94.2% white and has only 3.1% of its residents living below the poverty line. Unlike these predominantly white communities, there was a substantial need for a minimum wage law in Birmingham, and the likely beneficiaries of the Birmingham ordinance were, predominantly, African-American.

58.     Defendants' assertions of the need for uniformity in application of minimum wage requirements throughout Alabama are pretextual, in light of the Legislature's history of less favorable treatment of predominantly African-American jurisdictions in the Legislature's granting of economic development authority to local jurisdictions (See Will Parker, "Still Afraid Od "Negro Domination?": Why County Home Rule Limitations in the Alabama Constitution of 1901 are Unconstitutional," 57 Ala. L. Rev. 545 (Winter 2005)) and in light of the Legislature's acceptance of non-uniformity in other areas of economic regulation, including but not limited to the sales tax.  Defendants' departure from procedural norms to obtain passage of HB174 also evidences discriminatory intent.

59.     Further, contrary to the assertions of the HB 174's supporters that passage of a minimum wage ordinance would be detrimental to Birmingham residents, economic studies show that enactment of a minimum wage would not have resulted in job loss or economic

instability. The Legislature cited no economic studies in support its position and instead relied on stereotypes about race and other pretexts to justify its actions.

60.     The State Legislature also disregarded procedural requirements related to legislation that affects only a single municipality at the time of enactment. The State did not provide requisite notice to citizens of Birmingham before enacting a provision that nullified the City's wage ordinance.  At the time of HB 174's enactment, Birmingham was the only city to have enacted an ordinance affected by HB 174.  Disregarding these procedural notice provisions supports the inference of improper discriminatory motive.

## COUNT III

### (Equal Protection Claim Based on Political Process Doctrine)

61.     Additionally and separately from the equal protection harm that can be traced to the 1901 Constitution's discriminatory refusal to grant municipal home rule, HB 174 violates the Fourteenth Amendment's equal protection clause because it specifically targeted an ordinance that Birmingham's African-American community and their City Council strongly supported.

62.      HB 174 preempts a city ordinance that primarily inured to the benefit of Birmingham's African-American community.  Moreover, Birmingham's African-American community (as the organizational Plaintiffs can attest to) strongly considered the ordinance to be in their interest. Indeed, as noted above, the City Council passed multiple ordinances accelerating the provisions of the wage ordinance in an effort to prevent the State from nullifying the ordinance and usurping all authority to regulate and set policy pertaining to wages, leave or other employment benefits.

63.     The State's adoption of HB 174 violated the Fourteenth Amendment's equal protection guarantee because it placed all decision-making authority regarding wages, leave or other employment benefits at the State level rather than the leaving such authority to the City. The intent to uniquely burden the ability of Plaintiffs to obtain employment-related ordinances that Birmingham's African-American community strongly favored motivated the decision to give the State Legislature "complete control" over regulation and policy pertaining to wages, leave or other employment benefits.

64.     Moreover, Defendants' actions as alleged herein have violated 42 U.S.C. § 1983 and the equal protection clause of the Fourteenth Amendment to the United States Constitution by placing special burdens on racial minorities within the governmental process.

## PRAYER FOR RELIEF

**WHERFORE,** plaintiffs respectfully pray that this Court will grant them the following relief:

(A)     A declaratory judgment that the 1901 Constitution's deprivation of local self-governance over matters affecting primarily municipal residents violates the rights of Plaintiffs and (the members of the organizational Plaintiffs) guaranteed under the Equal Protection Clause of the Fourteenth Amendment and further declaring that Birmingham's wage ordinance constitutes a lawful exercise of municipal authority;

(B)     A declaratory judgment that HB 174 violates the rights of Plaintiffs and (the members of the organizational Plaintiffs) guaranteed under the Equal Protection Clause of the Fourteenth Amendment;

(C)     An injunction prohibiting defendants, their departments, officers, agents, attorneys, employees and those acting in concert with them or at their direction from enforcing

the provisions of HB 174 and/or taking any action to prevent Birmingham's wage ordinance from taking effect;

(D)     An award of their costs incurred in prosecuting this action, including an award of attorneys' fees and expenses, pursuant to 42 U.S.C. § 1988.

(E)     Such other and further equitable relief as the Court may deem just and equitable.


                                                   /s/ Richard P. Rouco
                                                   Richard P. Rouco

**OF COUNSEL:**

Glen M. Connor, Esq.
George N. Davies, Esq.
Richard P. Rouco, Esq.
**QUINN, CONNOR, WEAVER,**
  **DAVIES & ROUCO LLP**
2 – 20TH Street North, Suite 930
Birmingham, Alabama  35203
Telephone: 205-870-9989
Facsimile: 205-803-4143
gconnor@qcwdr.com
gdavies@qcwdr.com
rrouco@qcwdr.com

Robert H. Stroup, Esq.
LEVY RATNER, P.C.
80 Eighth Avenue, 8th Floor
New York, NY 10011
Tel. (212) 627-8100
Fax (212) 627-8182
rstroup@levyratner.com

Mary Joyce Carlson, Esq.
Mary Joyce Carlson
1100 New York Avenue, N.W.. Suite 500 West.
Washington, DC 20005
(202) 230-4096
carlsonmjj@yahoo.com