FILED
2016 Jun-30 PM 01:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

MARNIKA LEWIS, ANTOIN ADAMS, ALABAMA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, GREATER BIRMINGHAM MINISTRIES, ALABAMA LEGISLATIVE BLACK CAUCUS, LOUISE ALEXANDER, MARIKA COLEMAN, PRISCILLA DUNN, JUANDALYNN GIVAN, MARY MOORE, OLIVER ROBINSON, JOHN ROGERS, RODGER SMITHERMAN, and WILLIAM MUHAMMAD,

Plaintiffs,

v.

THE STATE OF ALABAMA, THE CITY OF BIRMINGHAM, LUTHER J. STRANGE, III, in his official capacity as Attorney General, and WILLIAM A. BELL, SR., in his official capacity as Mayor of Birmingham,

Defendants.

Case No.2:16-cv-690-RDP

# **AMENDED COMPLAINT**

Pursuant to F.R.C.P. Rule 15(a)(1) and the Court's June 7, 2016 Order, the Plaintiffs' amend their complaint to add parties and claims as follows:

## I. INTRODUCTION:

This is an action for a declaratory judgment that Act 2016-18, titled the Alabama Uniform Minimum Wage and Right-to-Work Act (a.k.a. HB 174 or Act 2016-18), violates the rights of Birmingham citizens and the citizens of other majority-black municipalities guaranteed by the Constitution and laws of the United States, and for preliminary and permanent injunctions requiring the defendant City of Birmingham to enforce Ordinance No. 16-28, relating to the minimum wage to be paid to employees by employers in the City of Birmingham, Alabama.

Act 2016-18 has the purpose and effect of transferring control over minimum wages and all matters involving private sector employment in the City of Birmingham from municipal officials elected by a majority-black local electorate to legislators elected by a statewide majority-white electorate. It perpetuates an official policy of political white supremacy that has been maintained in Alabama since it became a state in 1819, whereby white control is preserved by state government over the governing bodies of majority-black counties, cities, and educational institutions.

Thus Act 2016-18 violates Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, and the Thirteenth, Fourteenth, and Fifteenth Amendments to the Constitution of the United States. Further, Act 2016-18 was enacted with the intent

of discriminating against the people who live and work in the City of Birmingham on the basis of race, contrary to the Fourteenth Amendment to the United States Constitution.

## II. PARTIES

1. Plaintiffs Marnika Lewis and Antoin Adams are African-American citizens of the United States who are registered voters in the City of Birmingham. Each of them is employed in the City of Birmingham at wages that are less than $10.10 per hour.

2. Plaintiff Alabama State Conference of the National Association for the Advancement of Colored People ("the Alabama NAACP") is a state subsidiary of the National Association for the Advancement of Colored People, Inc. The Alabama NAACP is the oldest and one of the most significant civil rights organizations in Alabama, and it works to ensure the political, educational, social, and economic equality of African Americans and all other Americans. Eliminating the racial wage gap is a key focus of the Alabama NAACP. To that end, it advocates for a living wage in low paying industries where workers of color are disproportionately represented and especially concentrated. The Alabama NAACP is composed of 48 branches across the state of Alabama, including the Metro Birmingham branch. The Alabama NAACP has significant membership in the City of Birmingham and many of those members will be directly impacted and harmed

by ACT 2016-18. One member is Jaime Chrishon. Ms. Chrishon is an African-American woman who resides in City of Birmingham. She has lifetime membership to the NAACP. Ms. Chrishon is employed as a crewmember at Popeye's located on Messer Airport Highway. She earns $7.25 per hour. As a result of HB 174, Ms. Chrishon will not receive the pay increase guaranteed under Ordinance 16-28.

3. The Alabama NAACP also has standing to challenge Act 2016-18 on its own behalf. Act 2016-18, has deprived Birmingham residents of their democratically adopted minimum wage increase. As a result, the Alabama NAACP will be forced to divert time, money, and personnel to educating African-American workers about the law and its impact.

4. Organizational Plaintiff Greater Birmingham Ministries ("GBM") was founded in 1969 in response to the urgent human rights and justice needs of the residents of the greater Birmingham, Alabama, area. GBM is a multi-faith, multi-racial organization that provides emergency services for people in need. It engages in community efforts to create systemic change with the goal of building a strong, supportive, and politically active society that pursues justice for all people. A central goal of GBM is the pursuit of social justice in the governance of Alabama. GBM actively opposes state laws, policies, and practices that result in the exclusion of vulnerable groups or individuals from the democratic process. Toward

that end, GBM regularly engages in efforts to register, educate, and increase turnout among African-American voters, as well as low-income voters in general. GBM has participated in lawsuits to vindicate these democratic principles.

5. GBM has standing to sue on behalf of its members. GBM counts Christian, Muslim, and Jewish faith communities among its members, as well as individual temples, churches, and mosques, including New Pilgrim Baptist Church. African-American individuals from GBM congregations have been harmed as a result of Act 2016-18.

6. GBM also has standing to sue on its own behalf. GBM has a number of poverty relief programs that support working families and individuals in the city of Birmingham including its utility assistance program, food assistance program, clothes closet, Christmas drive, and a homeless shelter. As the result of Act 2016-18, GBM has had to divert resources to these programs to respond to poverty created by low wages.

7. Plaintiff Alabama Legislative Black Caucus (hereafter "ALBC") is an unincorporated political organization of African Americans elected to the Alabama Legislature. Every member of the ALBC is a citizen of the United States and registered voter in Alabama elected from a majority-black House or Senate district. Each of them represents one or more majority-black political subdivisions of the State of Alabama.

8. Plaintiffs Louise Alexander, Merika Coleman, Juandalynn Givan, Mary Moore, Oliver Robinson and John Rogers are African-American members of the Alabama House of Representatives and members of the ALBC. Representatives Alexander, Coleman, Givan, Moore and Rogers are members of the Jefferson County House Delegation. Plaintiffs Givan, Moore Robinson and Rogers are registered voters in the City of Birmingham.

9. Plaintiffs Priscilla Dunn and Rodger Smitherman are African-American members of the Alabama Senate and members of the ALBC. Senators Dunn and Smitherman are also members of the Jefferson County Senate Delegation. Plaintiff Smitherman is a registered voter in the City of Birmingham.

10. Plaintiff William Muhammad is a citizen of the United States and an African-American registered voter in the City of Birmingham.

11. Defendant State of Alabama is sued in its own name with respect to Plaintiffs' claims under § 2 of the Voting Rights Act, 52 U.S.C. § 10301. Congress has abrogated the State's Eleventh Amendment immunity in civil actions brought to enforce the rights guaranteed by the Voting Rights Act.

12. Defendant Luther J. Strange, III is the Attorney General for the State of Alabama and its chief legal officer. The Attorney General has broad common law and statutory powers to direct and oversee all litigation, civil or criminal, which concerns the interest of the State of Alabama. This includes litigation in

federal court "in any case in which the state may be interested in the result." He is named in his official capacity.

13. Strange has advised numerous persons, including governmental and non-governmental actors, regarding the enforcement of the Birmingham wage ordinance and the effect of the State's passage of the wage preemption law. For example, in February, 2016, prior to the effective date of the ordinance, Strange advised Birmingham businesses, through a press release, that "despite the terms of the ordinance, they will have a reasonable time to prepare to comply, [with the Birmingham ordinance]" and expressed his opinion that the ordinance "does not provide a reasonable time for employers to prepare to comply." He also advised that "the Alabama Legislature is currently addressing this issue and I expect it will be resolved shortly without adversely affecting the citizens of Birmingham."

14. Regarding the State's powers with respect to the Birmingham minimum wage ordinance, Strange also opined publicly, through a spokesperson, that "the Legislature has the authority to preempt local ordinances, even those that are already in effect."

15. Strange is also charged under Alabama law with reviewing statutes passed by the Alabama legislature for their constitutional validity and to make a report to the Governor and the Chairman of the Judiciary Committees of the House and Senate of the laws or parts of laws which have been held invalid by courts of

last resort.

16. The City of Birmingham is a municipality of the State of Alabama whose Mayor and Council are elected by a majority-black local electorate. The City of Birmingham is not enforcing Ordinance 16-28 because of Act 2016-18.

17. William A. Bell, Sr., is sued in his official capacity as Mayor of the City of Birmingham. Defendant Bell, acting through the Legal Department or other city agency, has the duty to take appropriate steps to enforce Ordinance No. 16-28, and under the Mayor-Council Act of 1955, as amended by Ala. Act No. 2016-277, he has the duty to "enforce all laws and ordinances." Mayor Bell has not acted to enforce Ordinance 16-28 because of Act 2016-18.

18. The City of Birmingham and Mayor Bell are named as defendants only for the purpose of providing complete relief among the parties with respect to the claims raised herein.

## III. JURISDICTION & VENUE

19. This Court has jurisdiction of the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1343(c) and 52 U.S.C. § 10302, to redress the deprivation of Plaintiffs' rights guaranteed by the Voting Rights Act, 42 U.S.C. § 1983, and the Thirteenth, Fourteenth, and Fifteenth Amendments.

20. Venue of this action lies in the Middle District of Alabama pursuant to U.S.C. § 1391(b).

## IV. STATEMENT OF FACTS

21. On August 18, 2015, the Birmingham City Council, relying on its broad authority under the Mayor-Council Act of 1955, as amended, adopted Ordinance No. 15-124, raising the minimum wage in the City of Birmingham effective July 1, 2016.

22. On February 9, 2016, the third day of the 2016 Regular Session of the Alabama Legislature, HB 174 was introduced, sponsored by 61 white House members, including 8 of the 10 members of the Jefferson County Local Delegation elected from majority-white districts.

23. On February 16, 2016, HB 174 passed the House, 71 to 31, and was sent to the Senate. All 27 black House members voted no, including all 8 black members of the Jefferson County House Delegation. Of the 10 white members of the Jefferson County House Delegation, 9 voted yes and 1 was absent.

24. On February 19, 2016, the Birmingham City Council adopted Ordinance No. 16-25, which changed the effective date for raising the minimum wage to March 1, 2016.

25. On February 23, 2016, the Birmingham City Council adopted Ordinance No. 16-28, which changed the effective date for raising the minimum wage to $10.10 on February 24, 2016, and provided that the minimum wage must be raised each year to match the increase in cost of living.

26. On February 25, 2016, the Senate passed HB 174, 23 to 11, and sent it to the Governor, who signed it as Act 2016-18 that same day. All 7 black senators voted no, including all 3 black members of the Jefferson County Senate Delegation. All 5 white members of the Jefferson County Senate Delegation voted yes.

27. Act 2016-18 prohibits any political subdivision from raising the minimum wage or mandating any other terms and conditions of employment beyond what is required by state or federal law. The City of Birmingham is the only political subdivision in Alabama to have regulated the minimum wage. Since there is no minimum wage in Alabama law, the federal minimum wage of $7.25 per hour now governs the City of Birmingham.

28. In Alabama, 6.8% of 1,125,00 hourly workers earn at or below the minimum wage of $7.25.

29. According to statistics compiled by the National Employment Law Project, roughly 19% of Birmingham workers - 40,000 people - earn less than $10.10.

30. The legislature's pre-emption of the Birmingham wage law adversely impacted black workers. On average, white wage earners in Birmingham earn $1.41 more per hour than black wage earners. While 37% of black wage workers in Birmingham earn wages of $10.10 or less, only 27% of white wage workers

earn at or below that level. Statewide, the wage gap between white and black workers is even greater than in Birmingham, with white wage workers earning, on average, $2.12 more than black wage workers for each hour worked.

31. According to U.S. Census estimates for 2016, blacks or African Americans constitute 26% of Alabama's total population of 4,779,736. Blacks or African Americans are 73% of Birmingham's total population of 212,237.

32. According to the 2010 census, blacks or African Americans were 24.86% of the voting-age population in Alabama, while they were 70.04% of the voting-age population in the City of Birmingham.

33. According to the 2010 census, blacks or African Americans were 27.79% of registered voters in Alabama, while they were 78.58% of registered voters in the City of Birmingham.

34. Voting is racially polarized in Alabama statewide and at the local government level.

35. In the Legislature there are 27 majority-black (voting age) House districts and 8 majority-black Senate districts, but there are no African Americans elected to statewide office. Oscar Adams, elected to the Alabama Supreme Court in 1982 and 1988, and Ralph Cook, elected to the Alabama Supreme Court in 1994, are the only African Americans since Reconstruction to be elected to statewide office in Alabama history.

36. Today, black political power still has its greatest influence at the local levels of government. There are 12 majority-black (total population) counties in Alabama, all located in the Black Belt: Sumter, Greene, Hale, Marengo, Perry, Dallas, Wilcox, Lowndes, Montgomery, Macon, Bullock, and Barbour.

37. According to the 2000 census there are 2 majority-black municipalities over 100,000 people in Alabama, Birmingham and Montgomery, 2 majority-black municipalities between 25,000 and 100,000 people, Bessemer and Prichard, and 67 majority-black municipalities with fewer than 25,000 people.

38. Act 2016-18 perpetuates Alabama's *de jure* policy of white supremacy, in particular its suppression of local black majorities through imposition of white control by state government.

39. Before the Civil War, white supremacy was maintained through slavery, which was guaranteed by the 1819 Constitution. Even free blacks could not vote; the 1819 Constitution, the 1861 Secession Constitution, and even the 1865 Presidential Reconstruction Constitution all restricted the franchise to white males. State law made educating blacks, slave or free, a criminal offense.

40. The antebellum constitutions guaranteed popular election of county officials. Disfranchised slave majorities were tied to the land as cheap laborers, who enabled whites in the Black Belt counties to become the wealthiest citizens in the nation.

41. Many non-slaveholding whites in the northern counties could not compete with the slave economy and were reduced to subsistence farming. Their support of slavery and, eventually, secession was contrary to the economic interests of the overwhelming majority of white Alabamians and was the first example of Alabama's official policy of white supremacy benefitting the wealthy at the expense of the working classes.

42. Because the 1819 Constitution apportioned seats in the Legislature based on white population, the white counties outside the Black Belt initially had majority control, and they enacted slave taxes and other taxes on wealth to fund state and local government. The white yeomanry paid virtually no taxes. But in the last antebellum decade representatives of the Black Belt gained more legislative power and began replacing the slave tax with land taxes that non-slaveholding whites had to pay.

43. At the end of the Civil War, Congressional Reconstruction began in 1867, which, protected by the federal army, temporarily disfranchised former Confederate officials, enfranchised blacks, and gave Republicans control of Alabama government. Black men, mostly from the Black Belt, were elected to the Legislature and county offices, but white Republicans (carpetbaggers and scalawags) exercised control over both state and local governments.

44. The Reconstruction Legislature greatly increased land taxes to pay for

public schools and other services for a citizenry that now included freedmen. This tax burden fell on white landowners, who bitterly resented paying for the education of blacks. Many white subsistence farmers could not afford the property taxes and lost their land. The hardships and humiliations of the Reconstruction era became embedded in white memory, and resentment of federal rule remains part of Alabama's political culture today.

45. When white Conservative Democrats regained control of state government in the 1874 election, they "redeemed" Alabama from "black rule" and enacted the repressive 1875 Redeemer Constitution. The 1875 constitutional convention was controlled by Black Belt planters and representatives of railway, mining, and financial interests (known in Alabama as the Bourbon Aristocracy and Big Mules). They placed provisions in the 1875 Constitution designed to prevent coalitions of blacks and whites from ever again using their electoral majorities to raise their taxes or interfere with their ability to maintain a cheap labor force to work on their plantations and in their mines. Chief among these constitutional provisions were restraints on home rule, on the ability of county and municipal governments to raise their own revenues or to regulate their local economies. The white counties were persuaded to ratify these terms against their own interests when the Democratic Party drew the color line and invoked white supremacy.

46. The 1875 Redeemer Constitution did not disfranchise blacks for fear

of federal enforcement of the Fifteenth Amendment. So Black Belt whites devised both legal and extra-legal methods for controlling their overwhelming black majorities. The legal means included enacting statutes that removed local electoral control of many Black Belt county governments, giving the Governor authority to appoint those county officials. The extra-legal means were the use of violence and economic intimidation to control the votes of black sharecroppers, and outright fraudulent stuffing of ballot boxes. Black Belt whites "voted" their black majorities in support of white Democratic candidates both to maintain their control of the Legislature and locally to prevent their land from being taxed.

47. Racially segregated schools made it possible for Black Belt whites to appropriate and redirect to their white schools the state school revenues apportioned to their black schools. Because the Black Belt white schools needed little local school revenue, Black Belt politicians succeeded in defeating efforts by other white county legislators to raise constitutional millage caps on local funding for their white schools. In this way the funding mechanisms supporting *de jure* school segregation in Alabama helped suppress the wages and economic opportunities of both black and white workers throughout Alabama.

48. Alabama's policy of white control of schools educating black students, whose purpose, according to Senator John Tyler Morgan, was to combat the danger that "education would spoil a good plow-hand," succeeded until the

1970s, when, in response to federal court-ordered desegregation, whites in the Black Belt counties left their public schools en masse, leaving behind virtually all-black student bodies.

49. In 1975, under the sponsorship of newly-elected black legislators, the two historically black state universities, Alabama State University (ASU) and Alabama A&M University (AAMU) were able to obtain their own governing boards. *Knight v. Alabama*, 787 F.Supp. 1030, 1139-40 (N.D. Ala. 1991), aff'd in relevant part, 14 F.3d 1534 (11th Cir. 1994).

50. As the court noted in *Knight v. Alabama*, "Since Alabama became a state, it has maintained through a variety of historical circumstances a steadfast policy of imposing white control over the public education of black people. This racially motivated policy was crucial to the regime of white supremacy for two purposes: (1) to make sure the content, values and style of blacks' education prepared them for subordinate roles in society, and (2) to ensure that white persons would never be forced to submit to the authority of black persons. African Americans have always understood that their educational opportunities depended on the extent to which they could gain a measure of control over their own institutions, and that their ability to combat the policy of white control directly depended on the extent to which black citizens could gain a share of effective political power. Among the earliest achievements of blacks elected as a result of

the 1965 Voting Rights Act and federal court legislative reapportionment decrees were creation of independent, majority-black boards for ASU and AAMU and corresponding increases in their state appropriations." *Id.* at 1052. Public education, however, was not the only area of African American life the Legislature sought to dominate and preempt local efforts of improvement.

51. The most notorious method Black Belt whites and the Legislature they dominated used to control their black majorities and to keep them on the land as cheap labor was the brutal convict leasing and peonage system that began during Radical Reconstruction and continued well into the twentieth century. Black men and women were rounded up and convicted of vagrancy or breaking their labor contracts, then were leased out to farmers and mining companies. The revenues from convict leases helped compensate for the property taxes landowners were evading and provided over one-third the operating budgets of both state and county governments, who competed with each other to capture and convict the most black prisoners. White workers outside the Black Belt had their wages suppressed by convict lease competition, but they did not have the political power to oppose the Bourbons and Big Mules and could not bring an end to the convict lease system, which only ended in the 1920s.

52. In the 1890s the Bourbon/Big Mule alliance again drew the color line and used state government to undermine interracial coalitions of working men,

both in the agrarian Populist and Greenback Parties and in urban centers where labor unions became active. In particular, the United Mineworkers of America, known as UMW District 20, successfully organized black and white mine workers in Birmingham, breaking the segregation line.

53. In 1901, Alabama adopted a new Constitution was adopted that would fully disfranchise almost all black citizens – and many poor whites as well. The 1901 Alabama Constitution retained the 1875 Constitution's restrictions on local taxation and other home rule powers and added a set of provisions aimed at disfranchising blacks: a cumulative poll tax, a literacy test, a property ownership requirement, and a list of crimes tailored to disqualify blacks.

54. The avowed purpose of the 1901 Constitution was made clear by John B. Knox, Chairman of the Constitutional Convention: "And what is it that we want to do? Why it is within the limits imposed by the Federal Constitution, to establish white supremacy in this State." *Hunter v. Underwood*, 471 U.S. 222, 229 (1985) (quoting 1 Official Proceedings of the Constitutional Convention of the State of Alabama, May 21st, 1901, to September 3rd, 1901, p. 8 (1940)).

55. Working class whites supported disenfranchising blacks, but they understood they and their children also would be disfranchised by the 1901 Constitution. So many white counties voted against ratification, and the new constitution would have failed had it not been for Black Belt whites, who for the

last time fraudulently voted their black majorities, effectively making them vote to disfranchise themselves.

56. The suffrage restrictions in the 1901 Constitution had their desired effect. In 1900 there were 181,000 registered black male voters; in 1903 there were fewer than 5,000. In the first election held after enactment of the 1901 Constitution, overall voter turnout declined by 38% (the white turnout by 19%, black voting by 96%).

57. During the first sixty-five years of the twentieth century, when blacks in Alabama were disfranchised, the Legislature allowed all-white electorates in many counties and cities to restore single-member district elections for their local governing bodies. But as the number of black voters gradually increased after World War II, the Legislature switched back to at-large election of local officials and adopted other laws to preserve white control of black majorities, such as anti-single-shot voting and numbered place laws, and the racial gerrymandering of the City of Tuskegee, which the Supreme Court struck down in *Gomillion v. Lightfoot* (1960).

58. In 1957, out of fear that blacks were gaining too much political power in the Black Belt, Macon County Senator Sam Engelhardt, Jr., who was also the President of the Alabama White Citizens Council, sponsored Amendment 132 to the Alabama Constitution, which authorized the Legislature to abolish Macon

County. The *Birmingham News* reported:

> **Segregationists Win:** Alabama Votes Macon County Abolition; Election Follows Tuskegee Boycott
>
> Birmingham, Ala. Dec. 18 [1957.] Alabama voters yesterday authorized the Legislature to abolish Macon County rather than see it come under Negro domination. The County may now be abolished by legislative act and its territory added to adjoining counties where whites are in the majority.

After the passage of the constitutional amendment, legislators in the neighboring counties were unable to agree on a division and parceling out of Macon County, because none wanted to increase his county's percentage of black voters.

59. In 1960, before Congress passed the Voting Rights Act, only 13.7% of voting age blacks were registered to vote in Alabama, and in 1965 there were only six black elected officials anywhere in the state.

60. Bloody Sunday in Selma made Alabama the cradle of the Voting Rights Act of 1965. Under Governor George C. Wallace, Alabama resisted enforcement of the Voting Rights Act, particularly as it began to empower black majorities at the local level.

61. Little progress was made providing black voters equal access to election of their county and municipal governing bodies until 1982, when Judge Virgil Pittman, on remand from the Supreme Court in *City of Mobile v. Bolden*, found purposeful discrimination behind the laws requiring at-large election of

Mobile city officials, and Congress amended the Voting Rights Act to outlaw election methods that resulted in dilution of black voting strength regardless of invidious intent.

62. The Voting Rights Act may have had its greatest impact on Alabama through *Dillard v. Crenshaw County*, a statewide defendant class action begun in 1985 alleging that the use of at-large elections in 192 political subdivisions from sixty-one of Alabama's sixty-seven counties violated Section 2 of the Voting Rights Act as it was amended in 1982. By the year 2000, black elected officials had achieved close to representational parity on county commissions, county school boards, and city councils in Alabama, reflecting the black voting age population of 22.7% in the state.

63. By 2010, when the last *Dillard* cases were dismissed, there were 757 black local elected officials. In the legislature there were twenty-seven majority-black House districts and eight majority-black Senate districts, but there were no African Americans elected to statewide office. Today, black political power still has its greatest influence at the local levels of government.

64. The price Black Belt whites had demanded and received in 1901 in return for abandoning their captive black vote was continuing control of the Legislature. The apportionment of legislative seats in the 1901 Constitution itself was malapportioned in favor of the Black Belt counties. And for the next sixty-

five years, representatives of the Black Belt beat back efforts by conservative Governors like Frank Dixon and populist Governors like Jim Folsom to get the Legislature to comply with its constitutional duty to reapportion seats among counties after every decennial census. Reapportionment occurred only after urban leaders in Birmingham and Mobile persuaded the U.S. Supreme Court in *Reynolds v. Sims* (1964) to proclaim the Fourteenth Amendment right to one person, one vote and order the Alabama Legislature to apportion seats in the House and Senate based on substantial population equality.

65. The 1901 Constitution solidified control of the Legislature by the Black Belt/Big Mule alliance, and "Bourbon rule" of Alabama would continue well into the 1980s. The disenfranchisement of poor whites as well as blacks prevented any reoccurrence of a populist, interracial political opposition to Alabama's employer-friendly, anti-union, low-wage, and low-property tax policies.

66. The 1901 Constitution also entrenched white legislative control of local governments. Since adoption of the 1875 "Redeemer" Alabama Constitution, the state has denied home rule to its counties in order to "guarantee[] the maintenance of white supremacy in majority-black counties." *Knight v. Alabama*, 458 F.Supp.2d 1273, 1284-85 (N.D. Ala.), aff'd 476 F.3d 1219 (11th Cir.), cert. denied, 551 U.S. 1146 (2007). The real legislatures of counties and cities are the members of their county legislative delegations, the House members and Senators

elected by voters in each county. Under the informal rule of "local courtesy," the entire Legislature will routinely enact any local bill pertaining solely to one county or city so long as the affected county's local delegation agrees to it.

67. As a consequence of the retention of these powers at the state level, majority black governments have historically been denied and continue to be denied opportunities to pursue local economic development on the same basis as majority white governments. (See Will Parker, "Still Afraid of Negro Domination?": Why County Home Rule Limitations in the Alabama Constitution of 1901 are Unconstitutional," 57 Ala. L. Rev. 545, 562 (Winter 2005):

> "black counties received increased power to engage in economic development at a slower rate than white counties. Only three of the first twelve counties to get relief from the restraint embodied in section 94 were black counties. Next, more than half of white counties have secured constitutional amendments allowing them to carry on such government functions as drainage control, fire protection, and sewage removal; meanwhile, only one third of black counties have secured similar authority. Finally, of the first twenty-one counties to receive constitutional permission regarding county officials' retirement plans, only two were black."

68. Though the City of Birmingham as a result of the Mayor Council Act of 1955 has much greater power than counties under Alabama law, the same pattern of majority white State government preempting and controlling local governance on account of race applies to the adoption of HB 174.

69. Voters in the majority-black Black Belt counties did not elect

candidates of their choice to represent them in the Legislature until after the 1983 special election ordered by a federal court. Preparing for the inevitable, Governor George C. Wallace used the popularity of his segregationist policies to help white Black Belt representatives enact and obtain ratification of Amendment 325, in 1972, and Amendment 373, in 1978, that to this day restrict the ability of black-elected tax assessors to assess valuable farm and timber land for property tax purposes above the artificially low levels the amendments set out in the Alabama Constitution. Amendments 325 and 373 have left the nearly all-black public schools in the Black Belt bereft of local school funding.

70. Before they left office, the white legislators representing majority-black Greene County, exercising their local courtesy powers, passed Act No. 1983-507, which transferred the power to appoint members of the Greene County Racing Commission from the Greene County legislative delegation, elected by Greene County voters, to the Governor, elected by the majority-white statewide electorate. A three-judge federal court struck down Act 1983-507 for having failed to obtain preclearance under Section 5 of the Voting Rights Act. *Hardy v. Wallace*, 603 F.Supp. 174 (N.D. Ala. 1985) (three-judge court).

71. Local black electorates lost protection against legislative acts that cause retrogression in their electoral power when the U.S. Supreme Court ruled in *Shelby County v. Holder* (2013), that the coverage formula in Section 4 of the

Voting Rights Act was unconstitutional. Although Alabama's Shelby County brief claimed there were no longer barriers to blacks' voting rights, Alabama did not renounce its historical policy of preserving white control of local majority-black electorates.

72. Until 1974, when the first federal court-ordered single-member districts were used to elect legislators, seats in the Alabama House and Senate were apportioned to each county on the basis of its relative population, and only residents of each county voted for their local delegation. *Reynolds v. Sims* held that the integrity of county boundaries must give way to one person, one vote, but only so far as necessary to reach substantial population equality among House and Senate districts. In each redistricting after the 1980 census the single-member districts drawn by the Legislature have increasingly ignored county boundaries. The House and Senate redistricting plans enacted in 2012, which currently are pending review by a three-judge district court in Montgomery, split the boundaries of 50 of Alabama's 67 counties. Each county split creates additional non-residents of the county who vote for members of the county local delegation and dilutes the voting strength of county residents. The Legislature has used county splits to preserve white control over many majority-black counties and cities.

73. A particularly telling example of the use of county boundary splits to maintain white control of local governments concerns Birmingham and Jefferson

County. To comply with one person, one vote, fourteen House districts could be drawn for Jefferson County, none of them crossing the county boundaries and nine of the fourteen (64%) majority-black. Six Senate districts could be drawn for Jefferson County, three of them majority-black, with only one majority-white Senate district crossing the county boundary. Instead, the Legislature in 2012 enacted plans that place Jefferson County in eighteen House districts, only eight (44%) of them majority-black. All of the majority-black House districts lie entirely inside Jefferson County, but six of the ten majority-white districts cross into six other majority-white counties.

74. The 2012 Senate plan puts Jefferson County in eight districts, three majority-black and five majority-white. All three of the majority-black Senate districts lie entirely inside Jefferson County, but all five of the majority-white districts cross the Jefferson County boundary to include parts of eleven other majority-white counties.

75. Altogether, 155,279 nonresidents vote for members of Jefferson County's House delegation, and 428,101 people residing in other majority-white counties vote for members of the Jefferson County Senate delegation.

76. The legislative redistricting plan enacted by the Legislature after the 2000 census had put nine majority-white and nine majority-black districts in the Jefferson County House Delegation, which, operating by majority vote, prevented

representatives of majority-white districts from approving bills opposed by the representatives of majority-black districts. But after filibuster-proof white Republican majorities were elected to both Houses in 2010, over the objections of black legislators, one majority-black House district was moved out of Jefferson County and was replaced by a majority-white district, which gave representatives of the white members of the Jefferson County House Delegation the ability to ignore the opposition of black members.

77. Last year, over the objections of black members, the white members of the Jefferson County Delegation procured passage of Act 2015-164, which gave municipalities and counties purchasing services from the Birmingham Water Works Board authority to appoint representatives to that Board. Under general Alabama law, the power to appoint municipal water board members is reserved exclusively to the municipality's council. The City of Birmingham's water board operates one of the most profitable water systems in Alabama and has been a valuable asset providing economic development for the citizens of Birmingham. Act 2015-164 made Birmingham's water board, which was subject to the control of its majority-black electorate, the only municipal water board in Alabama whose governance now must be shared with neighboring cities and counties, all of which are majority-white. In this way, the Legislature, elected by a statewide white majority, diluted the power of a majority-black municipal electorate to exercise

control over its own water board.

78. The Birmingham water board takeover act (Act 2015-164), like Act 2016-18, altered the voting power of Birmingham residents by removing from their elected representatives and transferring to the majority white state decision-makers authority to control local economic welfare and development policy previously resting within their authority.

79. The continuing racial nature of Alabama's legislative decision-making was noted by the Court in *United States v. McGregor*, 824 F.Supp.2d 1339-1345-47 (M.D. Ala., 2011), where the Court, in considering the motives of white legislators with respect to their opposition to placing a gambling referendum on the ballot, concluded that their motives, as reflected in tape recordings of their conversations with "other influential Republican legislative allies" were overtly racial, referring to black voters in racially derogatory terms and "singl[ing] out African-Americans for mockery and racial abuse." The Court further stated "that political exclusion through racism remains a real and enduring problem in this State."

80. In 2011, the Alabama legislature adopted a comprehensive immigration law described by its co-sponsors as "designed to reduce the number of illegal aliens in the state." They sought to do so by attacking "every aspect of an illegal immigrant's life," … "so they will deport themselves." *Cent. Ala. Fair*

*Hous. Ctr. v. Magee*, 835 F.Supp.2d 1165, 1182 & n.14 (M.D. Ala. 2011), vacated on other grounds 2013 WL 2372302 (11th Cir. 2013). The Court in *Magee* enjoined portions of the 2011 immigration law, concluding that there was substantial evidence of racial animus, including legislators using "illegal immigrant as a code for Latino or Hispanic" and making "comments that reflect popular stereotypes about Mexicans and explicit distinctions along the lines of race and national origin." *Magee*, 835 F.Supp.2d at 1192-94 and nn. 20-21.

81. At least thirteen of the House sponsors of HB-174, the bill enacted into law as Act 2016-18, were also sponsors of HB-56, the House version of the sweeping immigration bill passed in 2011. Representatives Kerry Rich and Micky Ray Hammon, whose race-based statements were reviewed by the Court in *Magee*, *supra*, were also among the co-sponsors of HB-174. The leader of the House, Speaker Mike Hubbard, also co-sponsored both bills.

**Passage of Act 2016-18 (HB 174)**

82. As recounted above, on April 21, 2015, the Birmingham City Council unanimously passed a resolution asking the state Legislature to raise the minimum wage to $10 per hour across the state. City Councilman, Jay Roberson, in speaking in favor of the resolution stated that "their advocacy on increasing the minimum wage to $10 an hour in Alabama is an economic issue that will benefit all, . . . I hope the City of Birmingham and the business community will respectfully adhere

to this great economic boost for all hard working employees which hopefully will become law in the near future."[1]

83. Prior to this resolution, the State legislature had failed to take any action to establish a statewide minimum wage law and had, in fact, been indifferent to efforts to establish such a law.

84. Almost simultaneously with the rally and the passage of the Birmingham City Council's resolution calling for an increase in the minimum wage, Representative Arnold Mooney (a white representative from the 43rd District-Shelby) introduced bill HB 495 in the Alabama Legislature. HB 495 sought to prevent any municipality from requiring that employers provide wages, paid or unpaid leave, and/or vacation pay that is not required by federal or state law. HB 495 did not advance out of the Alabama House of Representatives and further consideration was postponed when the legislative session ended in early June 2015.

85. On August 18, 2015, the Birmingham City Council unanimously passed, with one abstention, Ordinance 15-124 that would raise the minimum wage for employees working in the city to $8.50 per hour as of July 1, 2016, and $10.10 per hour on July 1, 2017. The ordinance was published and went into effect on

---

[1] Birmingham City Council Endorses Campaign to Raise Minimum Wage, http://www.al.com/news/birmingham/index.ssf/2015/04/birmingham_city_council_endors_1.html, April 21, 2015.

August 30, 2015. The ordinance received wide spread approval among Birmingham's African-American residents, which comprise approximately seventy-three (73) percent of Birmingham's population, and as noted above, approximately 78.5 percent of registered voters in the City.

86. In reaction to the Birmingham City Council's ordinance increasing the minimum wage, on or about September 8, 2015, at the beginning of the Legislature's second special legislative session of 2015, Alabama House District 47 Representative David Faulkner, (a white representative of the Birmingham suburb of Mountain Brook),[2] introduced bill HB 27 that prevents cities such as Birmingham from raising the minimum wage. Faulkner stated that he was "shocked" that the city could raise the minimum wage for its residents.[3] Birmingham was the only city or governmental entity in the state to have passed a minimum wage ordinance at the time of Senator Faulkner's introduction of HB 27.

87. There was no public notice of the bill or an opportunity for hearing, and HB 27 did not advance through the Legislature during the second special session.

88. Undeterred by the lack of passage of HB 27, Representative Faulkner

[2] According to recent United States census figures, Mountain Brook is approximately 98% white and its median income of approximately $130,000.00 is more than six times higher than that of Birmingham.

[3] Alabama Lawmakers Consider Bill to Block City Minimum Wages, http://www.al.com/news/index.ssf/2015/09/alabama_lawmakers_consider_bil.html, September 9, 2015.

on February 9, 2016, the third day of the 2016 regular session of the Alabama Legislature, introduced HB 174 which combined Representative Mooney's HB 495 introduced in April of 2015 and Representative Faulkner's HB 27 introduced in September of 2015. HB 174 sought to block and declare void Birmingham's minimum wage ordinance passed in August of 2015. The fifty-three sponsors of HB 174 in the House (all of them white) squarely targeted Birmingham and its minimum wage ordinance as Birmingham was the only city or public entity in the state of Alabama that had raised its minimum wage above that required by federal law. No Alabama law provides for a minimum wage, nor did the supporters of HB 174 include any state-wide minimum wage within its provisions or encourage favorable consideration of such. The leadership of the House of Representatives fast-tracked HB 174 in the House, which held a short public hearing on the bill on February 11, 2016, and voted it out of the Committee on State Government by a vote of 10-3. All ten supporters of the bill in the House Committee were white.

89. On February 16, 2016, the House of Representatives approved the bill 71-31 and sent it to the Alabama Senate. All members of the House voting in favor of the bill were white; all twenty-seven African-American Representatives voted against the bill.

90. On February 23, 2016, the Birmingham City Council adopted Ordinance 16-28 entitled "An Ordinance Relating to Minimum Wage to Be Paid to

Employees by Employers in the City of Birmingham." Among the reasons the City Council adopted Ordinance 16-28, like Ordinances 15-124 and 16-25, was because "Poverty in the city of Birmingham is a problem that affects the general health and welfare of its citizens, it is incumbent upon the city to take legislative steps to help lift working families out of poverty, decrease income inequality, and boost our [Birmingham] economy."

91. Ordinance 16-28 moved the effective date of the minimum wage increase to February 24, 2016 and increased the minimum wage to $10.10. The City Council acted to move up the date of the minimum wage increase because the white supporters of HB 174 in the Alabama Legislature were fast-tracking HB 174 in an attempt to have it pass before the first wage increase provided in Birmingham's Ordinance took effect.

92. Birmingham Mayor William Bell signed Ordinance 16-28 on February 24, 2016. Upon information and belief, the Ordinance was published in the Birmingham News on Sunday, February 28, 2016.

93. The Alabama State Senate, led by Senator Jabo Waggoner (a white senator representing the Birmingham suburb of Vestavia Hills who had also sponsored the unconstitutional immigration bill), fast-tracked HB 174 in approximately 36 hours through the Senate Committee on Governmental Affairs and the Senate passed the bill on a 23-12 roll call vote on February 25, 2016. The

Committee did not provide adequate notice of any hearing on the proposed bill, and did not permit public comment on HB 174. All Senators voting in favor were white; all seven African-American members of the Senate voted against passage. The bill was delivered to Governor Robert Bentley on February 25 and it was signed by the Governor approximately ninety minutes after its passage in the Senate. Thus, the legislature, which had shown no interest in a minimum wage bill previously, passed and delivered the bill to the Governor for his signature within sixteen days of its introduction.

94. One specific provision of this new law renders null and void any municipal or county minimum wage ordinance enacted prior to passage of HB 174. This retroactive nullification of wage ordinances applied only to the City of Birmingham. Section 110 of the Alabama Constitution provides, in relevant respects, that a general law affecting only one municipality at the time of enactment must comply with the notice provisions of Section 106.

95. The notice provisions of Alabama Constitution Section 106 require, *inter alia*, that before a special, private or local law shall be passed, it must be published in the local newspaper for four consecutive weeks in the county or counties affected by the law.

96. The Alabama House of Representatives and the State Senate failed and refused to provide the notice required by Section 106 of the Constitution in an

effort to keep Birmingham Ordinance 16-28 from becoming effective.

97. State Senator Slade Blackwell, (a white senator from the wealthy Birmingham suburb of Mountain Brook) stated in support of the legislation and in opposition to the Birmingham ordinance that increases in the minimum wage especially hurt young people from poorer families who may not have easy access to trendy internships at colleges and private companies to build their skill set and resume. Since HB 174 was targeted only at Birmingham, which is predominately African-American and many of whose residents live below the poverty line, this statement by Senator Blackwell, was directed at the poor, African-American residents of the City of Birmingham. This statement, and others by white legislators, invoked racial stereotyping to justify denial of a living wage to African-American residents of the City of Birmingham.

98. In contrast to Birmingham's 32% of African-Americans living below the federal poverty level, only 2.57% of Mountain Brook's residents (97.2% white) are below the federal poverty level.

99. Just before the final vote, State Senator Bill Hightower, (a white businessman and real estate investor from Mobile), spoke in support of the bill saying "we should lower the minimum wage," and later posted on his Twitter account his claim that "raising the minimum wage hurts the poor."

100. Sen. Dick Brewbaker, (a white senator from Montgomery) said he

was concerned about the bill generally and speculated that "Montgomery would probably follow suit," if Birmingham's wage ordinance was allowed to stand. Brewbaker, too, was a sponsor of the 2011 race-based immigration act.

101. Montgomery is approximately 57% African-American and after Birmingham, has the second highest concentration of African-Americans among Alabama's large cities.

102. The passage of HB 174 by the Alabama Legislature fits a historical pattern of legislation that discriminates against African Americans and thwarts the efforts of African-Americans in the state of Alabama who seek to improve their economic and social well-being. The enactment of HB 174 resulted in approximately 40,000 low wage workers in Birmingham being denied a wage increase; the vast majority of these workers are African-American.

103. The Defendant City of Birmingham has not taken any steps to enforce Ordinance 16-28. The individual Plaintiffs Marnika Lewis and Antoin Adams currently work in the City of Birmingham and are paid less than $8.50 per hour. Such wage rate violates the provisions of Ordinance 16-28.

**COUNT I**

**Violation of § 2 of the Voting Rights Act: Results Standard**

104. The factual allegations contained in the preceding paragraphs are realleged as if set out fully herein.

105. Act 2016-18 is a standard, practice, or procedure which results in the denial or abridgement of the right of citizens of Birmingham to vote on account of their race, in violation of § 2 of the Voting Rights of 1965, as amended, 52 U.S.C. § 10301.

106. Act 2016-18 reverses a scheme of local control by citizens of Birmingham over the power to enact minimum wages and other terms and conditions of employment in their municipality by transferring that power from the city council elected by the majority-black Birmingham electorate to the Legislature elected by the majority-white state electorate.

107. The political processes leading to nomination or election in the State of Alabama, as opposed to the City of Birmingham, are not equally open to participation by African Americans, who have less opportunity than other members of the electorate to participate in the statewide political process and to elect representatives of their choice.

## COUNT II

### Perpetuation of Alabama's *de jure* Policy of Maintaining White Control Over Local Black Majorities in Violation of the Equal Protection Clause.

108. The factual allegations contained in the preceding paragraphs are realleged as if set out fully herein.

109. Act 2016-18 perpetuates Alabama's official policy of ensuring that

the governing bodies of those political subdivisions containing actual or potential black voting majorities remain subject to white political control.

110. Act 2016-18 prohibits the majority-black electorate of the City of Birmingham from exercising their electoral power over local government and the right to municipal self-government they had previously enjoyed with respect to economic interests of particular importance to African-American citizens of Alabama.

111. Thus Act 2016-18 denies black citizens of Birmingham equal protection of the law in violation of the Equal Protection Clause of Section 1 of the Fourteenth Amendment to the Constitution of the United States.

## COUNT III

### Perpetuation of Alabama's *de jure* Policy of Maintaining White Control Over Local Black Majorities in Violation of the Privileges or Immunities Clause.

112. The factual allegations contained in the preceding paragraphs are realleged as if set out fully herein.

113. Act 2016-18 perpetuates Alabama's official policy of ensuring that the governing bodies of those political subdivisions containing actual or potential black voting majorities remain subject to white political control.

114. Act 2016-18 prohibits the majority-black electorate of the City of Birmingham from exercising their electoral power over local government and the

right to municipal self-government they had previously enjoyed with respect to economic interests of particular importance to African-American citizens of Alabama.

115. Thus Act 2016-18 violates the Privileges or Immunities Clause of Section 1 of the Fourteenth Amendment to the Constitution of the United States, which guarantees that no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States.

## COUNT IV

### Perpetuation of Alabama's *de jure* Policy of Maintaining White Control Over Local Black Majorities in Violation of the Fifteenth Amendment.

116. The factual allegations contained in the preceding paragraphs are realleged as if set out fully herein.

117. Act 2016-18 perpetuates Alabama's official policy of ensuring that the governing bodies of those political subdivisions containing actual or potential black voting majorities remain subject to white political control.

118. Act 2016-18 prohibits the majority-black electorate of the City of Birmingham from exercising their electoral power over local government and the right to municipal self-government they had previously enjoyed with respect to economic interests of particular importance to African-American citizens of Alabama.

119. Thus Act 2016-18 denies or abridges the right to vote of black United States Citizens of Birmingham on account of their race, color, or previous condition of servitude and violates the Fifteenth Amendment to the Constitution of the United States.

## COUNT V

### Perpetuation of Alabama's *de jure* Policy of Maintaining White Control Over Local Black Majorities in Violation of the Thirteenth Amendment.

120. The factual allegations contained in the preceding paragraphs are realleged as if set out fully herein.

121. Act 2016-18 perpetuates Alabama's official policy of ensuring that the governing bodies of those political subdivisions containing actual or potential black voting majorities remain subject to white political control, and its corresponding official policy, originating in African slavery, of suppressing the political power of citizens of the United States, both black and white, to increase their incomes and to develop their local economies.

122. Thus Act 2016-18 is a badge or vestige of slavery and violates the Thirteenth Amendment to the Constitution of the United States.

## COUNT VI

### Vestiges of *de jure* Racial Segregation in Violation of the Equal Protection Clause

123. The factual allegations contained in the preceding paragraphs are

realleged as if set out fully herein.

124. Act 2016-18 perpetuates vestiges of Alabama's policy of *de jure* racial segregation and violates the Equal Protection Clause of Section 1 of the Fourteenth Amendment. Alabama has failed its affirmative constitutional duty to eliminate all such vestiges of *de jure* segregation.

125. First and foremost, Act 2016-18 is a vestige of Alabama's *de jure* policy of segregating its African-American citizens in state and local electorates. Under its policy of electoral segregation, Alabama has either completely disfranchised its black citizens, has sought to exclude black voters from its political subdivisions, has sought to submerge black voters in majority-white, at-large election systems, has sought to crack or pack black populations in single-member districts, has sought to segregate black and white voters in separate political parties, and has sought to segregate and minimize the political influence of legislators and local officials elected by black majorities.

126. All of these *de jure* policies of electoral segregation were intended, and are still intended, to preserve white control over black voters.

127. Alabama has an affirmative constitutional duty to eliminate to the extent practicable all vestiges of its *de jure* policies of racial segregation. But Alabama has taken no steps to eradicate vestiges of segregation that have not been mandated by federal courts or federal executive actions.

128. Instead, Alabama continues to evade its duty to eliminate vestiges of segregation and continues to enact laws that have both the purpose and effect of perpetuating its policy of electoral segregation. Act 2016-18 is only the latest example of this continuing violation of the rights of all black citizens of Alabama to equal protection of the laws.

129. Act 2016-18 also perpetuates vestiges of *de jure* school segregation in Jefferson County. Utilizing Alabama general laws that facilitate the creation of separate municipal school systems, some of which were enacted for the purpose of evading desegregation, eight municipal public school systems have split from the Jefferson County and City of Birmingham school systems to evade federal desegregation mandates: Homewood, Hoover, Leeds, Midfield, Mountain Brook, Tarrant, Trussville, and Vestavia Hills. The City of Gardendale currently is also seeking federal court permission to create its own municipal public school system. Every time one of these municipal school systems breaks away from Jefferson County and City of Birmingham systems they remove valuable public funding and other resources, particularly political resources, from the urban schools they left behind, leave black inner-city students in less well funded and more racially segregated schools.

130. Most of the minimum wage workers the City of Birmingham's Ordinance 16-28 will benefit attended or will attend the increasingly segregated

schools in Birmingham and surrounding Jefferson County. The Mayor and Council of Birmingham were responding to these citizens who elected them to represent their economic interests, including increasing their school revenues. Act 2016-18, however, was enacted by the white legislators who represent residents of the breakaway school districts, who no longer have a direct interest in revenues for Birmingham schools or for the financial success of Birmingham students. To the contrary, these white legislators disproportionately represent Birmingham employers who reside in the breakaway suburban school systems and who perceive Birmingham's minimum wage ordinance as being contrary to their interests. Thus the lack of responsiveness to the needs of Birmingham's minimum wage workers by the sponsors of Act 2016-18 is a vestige of Alabama's *de jure* policies of both political and school segregation.

## COUNT VII

### Intentional Racial Discrimination in Violation of § 2 of the Voting Rights Act and the Thirteenth, Fourteenth, and Fifteenth Amendments.

131. The factual allegations contained in the preceding paragraphs are realleged as if set out fully herein.

132. Act 2016-18 was enacted for the invidious purpose and with the racially discriminatory intent of denying the majority-black electorate of the City of Birmingham the ability to regulate the minimum wages and other terms and

conditions of employment within their municipality. It has its intended discriminatory effect on Birmingham's black citizens.

133. Thus Act 2016-18 violates § 2 of the Voting Rights Act, as amended, 52 U.S.C. § 10301; the Thirteenth Amendment; the Privileges or Immunities Clause and the Equal Protection Clauses of the Fourteenth Amendment; and the Fifteenth Amendment.

## COUNT VIII

### Racially-Motivated Enactment of Act 2016-18 Violates the Equal Protection Clause of the Fourteenth Amendment

134. The factual allegations contained in the preceding paragraphs are realleged as if set out fully herein.

135. Defendants' actions constitute intentional discrimination on the basis of race contrary to the Fourteenth Amendment.

136. The persons denied the benefits of the Birmingham minimum wage legislation are predominantly African-American. Approximately 32% of Birmingham's African-American residents had annual earnings below what they could have earned had the minimum wage ordinance become effective. The Alabama Legislature's enactment of Act 2016-18 denies the City of Birmingham the opportunity to obtain the same economic opportunities for its residents as is presently available to predominantly white communities throughout Alabama.

137. As noted above, pre-emption of the Birmingham wage law adversely impacted black workers. On average, white wage earners in Birmingham earn $1.41 more per hour than black wage earners. While 37% of black wage workers in Birmingham earn wages of $10.10 or less, only 27% of white wage workers earn at or below that level. Statewide, the wage gap between white and black workers is even greater than in Birmingham, with white wage workers earning, on average, $2.12 more than black wage workers for each hour worked.

138. Further, the City of Mountain Brook, home of the sponsor of Act 2016-18, with 97.2% of its residents white, has less than 3% of its residents with annual earnings below the federal poverty level. Additional support for Act 2016-18 came from Senator Waggoner, a white senator representing Vestavia Hills -- a city that is 94.2% white and has only 3.1% of its residents living below the poverty line. Unlike these predominantly white communities, there was a substantial need for a minimum wage law in Birmingham, and the likely beneficiaries of the Birmingham ordinance were, predominantly, African-American.

139. Defendants' assertions of the need for uniformity in application of minimum wage requirements throughout Alabama are pretextual, in light of the Legislature's history of less favorable treatment of predominantly African-American jurisdictions in the Legislature's granting of economic development authority to local jurisdictions (See Will Parker, "Still Afraid Od "Negro

Domination?": Why County Home Rule Limitations in the Alabama Constitution of 1901 are Unconstitutional," 57 Ala. L. Rev. 545, 562 (Winter 2005)) and in light of the Legislature's acceptance of non-uniformity in other areas of economic regulation, including but not limited to the sales tax. Defendants' departure from procedural norms to obtain passage of HB 174 also evidences discriminatory intent. The Alabama legislative committees considering HB 174 deviated from normal practices with respect to the consideration of legislation by, inter alia, failing to give the public proper information on the scheduling of hearings, failing to allow public testimony at the Senate hearing, and by rushing the bill to final votes and the Governor's signature after years of indifference to the issue.

140. Further, contrary to the assertions of Act 2016-18's supporters that passage of a minimum wage ordinance would be detrimental to Birmingham residents, economic studies show that increasing the minimum wage to $10.10 would not result in job loss or economic instability. The Legislature cited no economic studies in support of its position and instead relied on stereotypes about race and other pretexts to justify its actions. White majority local and county governments have not been subjected to such limitations upon their powers of governance.

141. The State Legislature also disregarded procedural requirements related to legislation that affects only a single municipality at the time of

enactment. The State did not provide requisite notice to citizens of Birmingham before enacting a provision that nullified the City's wage ordinance. At the time of Act 2016-18's enactment, Birmingham was the only city to have enacted an ordinance affected by Act 2016-18. Disregarding these procedural notice provisions supports the inference of improper discriminatory motive.

**COUNT IX**

**Equal Protection Claim Based on Political Process Doctrine**

142. Additionally and separately from the claims asserted above, Act 2016-18 violates the Fourteenth Amendment's equal protection clause because it specifically targeted an ordinance that Birmingham's African-American community and their City Council strongly supported.

143. Act 2016-18 preempts a city ordinance that primarily inured to the benefit of Birmingham's African-American community. Moreover, Birmingham's African-American community (as the organizational Plaintiffs can attest to) strongly considered the ordinance to be in their interest. Indeed, as noted above, the City Council passed multiple ordinances accelerating the provisions of the wage ordinance in an effort to prevent the State from nullifying the ordinance and usurping all authority to regulate and set policy pertaining to wages, leave or other employment benefits.

144. The State's adoption of Act 2016-18 violates the Fourteenth

Amendment's equal protection guarantee because it placed all decision-making authority regarding wages, leave or other employment benefits at the State level rather than leaving such authority to the City. The intent to uniquely burden the ability of Plaintiffs to obtain employment-related ordinances that Birmingham's African-American community strongly favored motivated the decision to give the State Legislature "complete control" over regulation and policy pertaining to wages, leave or other employment benefits.

145. Moreover, Defendants' actions as alleged herein have violated 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by placing special burdens on racial minorities within the governmental process.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs pray the Court will enter orders as follows:

A. A judgment declaring that Act 2016-18 violates the rights of citizens of the City of Birmingham and other municipalities governed by black voter majorities guaranteed by § 2 of the Voting Rights Act and the Thirteenth, Fourteenth, and Fifteenth Amendments.

B. Directing Defendant Luther J. Strange, III to give notice to Alabama legislators and to members of the public that Act 2016-18 contravenes §

2 of the Voting Rights Act and the Thirteenth, Fourteenth, and Fifteenth Amendments to the United States Constitution.

C. Preliminary and permanent injunctions ordering defendants City of Birmingham and/or the Mayor Bell to enforce City of Birmingham Ordinance 16-28.

D. Awarding Plaintiffs their reasonable costs and attorneys' fees, pursuant to 42 U.S.C. § 1988 and 52 U.S.C. § 10310.

E. Granting such other and further relief as the Court deems equitable and just.

/s/ *Richard P. Rouco*
Richard P. Rouco

**OF COUNSEL:**

Glen M. Connor, Esq.
George N. Davies, Esq.
Richard P. Rouco, Esq.
QUINN, CONNOR, WEAVER,
DAVIES & ROUCO LLP
2 – 20TH Street North, Suite 930
Birmingham, Alabama 35203
Telephone: 205-870-9989
Facsimile: 205-803-4143
gconnor@qcwdr.com
gdavies@qcwdr.com
rrouco@qcwdr.com

/s/ *James U. Blacksher*
James U. Blacksher

**OF COUNSEL:**

James U. Blacksher, Esq.
P.O. Box 636
Birmingham, AL 35201
phone: 205-591-7238
fax: 866-845-4395
jblacksher@ns.sympatico.ca

Edward Still, Esq.
EDWARD STILL LAW FIRM LLC
429 Green Springs Hwy, Ste. 161-304
Birmingham AL 35209
205-320-2882
still@votelaw.com

Robert H. Stroup, Esq.
LEVY RATNER, P.C.
80 Eighth Avenue, 8th Floor
New York, NY 10011
Tel. (212) 627-8100
Fax (212) 627-8182
rstroup@levyratner.com

Mary Joyce Carlson, Esq.
1100 New York Avenue, N.W..
Suite 500 West
Washington, DC 20005
(202) 230-4096
carlsonmjj@yahoo.com

Joe R. Whatley, Jr., Esq.
2001 Park Place North
1000 Park Place Tower
Birmingham, AL 35203
Direct: 1-205-488-1226
Facsimile: 1-800-922-4851
Email: jwhatley@whatleykallas.com

***Attorneys for Plaintiffs Marnika Lewis, Antoin Adams, Alabama State Conference of the National Association for the Advancement of Colored People, and Greater Birmingham Ministries***

U.W. Clemon, Esq.
WHITE ARNOLD AND DOWD
2025 Third Avenue North, Suite 500
Birmingham, AL 35203
205-323-3124
UWClemon@whitearnolddowd.com

***Attorneys for Alabama Legislative Black Caucus, Rep. Louise Alexander, Rep. Marika Coleman, Sen. Priscilla Dunn, Rep Juandalynn Givan, Rep. Mary Moore, Rep. Oliver Robinson, Rep. John Rogers, Sen. Rodger Smitherman, and William Muhammad***

**CERTIFICATE OF SERVICE**

I hereby certify that on June 30, 2016, I filed a true and correct copy of the foregoing via the Court's CM/ECF system, which will notify and serve the following:

David B. Byrne, Jr.
State of Alabama
Office of the Governor
Alabama State Capitol
600 Dexter Avenue, Suite NB-05
Montgomery, Alabama 36130

James W. Davis
William G. Parker, Jr.
Office of Attorney General
501 Washington Avenue
Montgomery, Alabama 36130

/s/ Richard P. Rouco
Richard P. Rouco

**DEFENDANTS TO BE SERVED BY CERTIFIED MAIL:**

The State of Alabama
c/o Governor Robert J. Bentley
Office of the Governor
600 Dexter Avenue
Montgomery, Alabama 36130

The City of Birmingham
c/o Mayor William A. Bell, Sr.
City Hall, Third Floor
710 20th Street North
Birmingham, AL 35203

William A. Bell, Sr.
City Hall, Third Floor
710 20th Street North
Birmingham, AL 35203