FILED
2016 Sep-21  PM 05:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
Southern Division

| | | |
|---|---|---|
| MARNIKA LEWIS, et al., | ) | |
|     *Plaintiffs*, | ) | Civil Action No. |
| | ) | 2:16-cv-690-RDP |
| v. | ) | |
| THE STATE OF ALABAMA, et al., | ) | |
|     *Defendants*. | ) | |
| | ) | |

# STATE DEFENDANTS' REPLY SUBMISSION
## IN RESPONSE TO EXHIBIT B OF THE COURT'S ORDER

Luther Strange
  *Attorney General*

James W. Davis
  *Deputy Attorney General*

William G. Parker, Jr.
  *Assistant Attorney General*

State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130
(334) 242-7300

**Counsel for the State of Alabama &
Alabama Attorney General Luther
Strange**

TABLE OF CONTENTS

Table of Authorities ....................................................................................................... ii

I.    The Court lacks jurisdiction to entertain the plaintiffs' claims ............................ 2

    A.    The plaintiffs lack standing to sue Attorney General Strange, the City of Birmingham, and Mayor Bell ...................................................... 2

    B.    The plaintiffs' claims against the State of Alabama are barred by sovereign immunity ................................................................................ 4

II.    The complaint fails to state a valid claim on the merits ..................................... 7

    A.    The Minimum Wage Act does not discriminate based on race in any conventional sense ...................................................................... 7

        1.    The law does not *facially* discriminate based on race (Count IX) ................................................................................. 7

        2.    The law does not *effectively* discriminate based on race (Counts VII, VIII) ...................................................................... 10

    B.    The Minimum Wage Act does not discriminate based on race under any of the amended complaint's novel legal theories ................................ 12

        1.    The law does not implicate voting rights (Counts I, IV) ......................... 13

        2.    The law cannot violate the Equal Protection Clause on a vestiges or perpetuation theory (Counts II, VI) ......................................... 14

        3.    The law does not implicate the Thirteenth Amendment (Count V) ................................................................................ 16

Conclusion .................................................................................................................. 17

Certificate of Service

TABLE OF AUTHORITIES

**Cases**

*Alabama v. Pugh*,
    438 U.S. 781 (1978)...................................................................................... 5

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)................................................................................ 11, 12

*Atascadero State Hosp. v. Scanlon*,
    473 U.S. 234 (1985)................................................................................... 5, 6

*Bd. of Trs. of Univ. of Ala. v. Garrett*,
    531 U.S. 356 (2001)...................................................................................... 5

*Bennett v. Spear*,
    520 U.S. 154 (1997)................................................................................... 2, 3

*City of Memphis v. Greene*,
    451 U.S. 100 (1981).................................................................................... 16

*Doe v. Pryor*,
    344 F.3d 1282 (11th Cir. 2003) ................................................................. 3, 4

*Dorsey v. U.S. Dep't of Labor*,
    41 F.3d 1551 (D.C. Cir. 1994) ..................................................................... 7

*Ex parte Young*,
    209 U.S. 123 (1908)...................................................................................... 6

*Flemming v. Nestor*,
    363 U.S. 603 (1960).................................................................................... 11

*Gomillion v. Lightfoot*,
    364 U.S. 339 (1960).................................................................................... 14

*Gregg v. Georgia*,
    428 153 (1976)............................................................................................. 8

*Hall v. Louisiana*,
    983 F. Supp. 2d 820 (M.D. La. 2013).......................................................... 5

*Hardy v. Wallace*,
    603 F. Supp. 174 (N.D. Ala. 1985) ............................................................ 13

*Hunter v. Underwood*,
    471 U.S. 222 (1985).................................................................................... 11

*Johnson v. Governor of Fla.*,
   405 F.3d 1214 (2005) ................................................................................. 14, 15

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ....................................................................................... 3

*Marks v. United States*,
   430 U.S. 188 (1977) ....................................................................................... 8

*Mixon v. Ohio*,
   193 F.3d 389 (6th Cir. 1999) ................................................................. 5, 6, 14

*New Orleans Campaign for a Living Wage v. City of New Orleans*,
   825 So. 2d 1088 (La. 2002) ......................................................................... 12

*Phillips v. Snyder*,
   ___ F.3d ___, No. 15-2394, 2016 WL 4728026 (6th Cir. Sept. 12, 2016) ................ 13, 14, 16

*Presley v. Etowah Cty. Comm'n*,
   502 U.S. 491 (1992) ................................................................................ 13, 14

*Reaves v. U.S. Dep't of Justice*,
   355 F. Supp. 2d 510 (D.D.C. 2005) ............................................................... 5

*Schuette v. Coal. to Defend Affirmative Action*,
   572 U.S. ___, 134 S. Ct. 1623 (2014) ...................................................... 7, 8, 9

*Terrebonne Parish NAACP v. Jindal*,
   154 F. Supp. 3d 354 (M.D. La. 2015) ............................................................ 5

*United States v. Fordice*,
   505 U.S. 717 (1992) ..................................................................................... 15

*United States v. Kozminski*,
   487 U.S. 931 (1988) ..................................................................................... 16

*Va. Office for Prot. & Advocacy v. Stewart*,
   563 U.S. 247 (2011) .................................................................................... 5, 6

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ..................................................................................... 10

*Washington v. Seattle Sch. Dist. No. 1*,
   458 U.S. 457 (1982) ....................................................................................... 9

**Statutes**

52 U.S.C. § 10301(a) ......................................................................................... 6

**Other Authorities**

Ala. Act No. 2016-18 ............................................................................................................... 3

Debra Burke, et al., *Minimum Wage and Unemployment Rates: A Study of
    Contiguous Counties*,
    46 GONZ. L. REV. 661 (2011) ........................................................................................... 12

STATE DEFENDANTS' REPLY SUBMISSION
IN RESPONSE TO EXHIBIT B OF THE COURT'S ORDER

On the merits, the plaintiffs' opposition brief creates a maze of vexing legal questions. Many of these relate to their theory that the Alabama Legislature enacted the Minimum Wage Act out of racist motives. For example: Suppose the same facts as alleged here, except that a predominantly white city had enacted a local minimum wage instead of Birmingham; would the plaintiffs then contend that the Minimum Wage Act was the product of purposeful racism? Or suppose the same facts as alleged here, except that multiple other cities, such as Tuscaloosa or Huntsville, had also enacted a local minimum wage; would the plaintiffs still claim racism then? And what is the role of the specific, $10.10 hourly rate Birmingham selected? If the Alabama Legislature had instead enacted a uniform minimum wage of $15 per hour, would that be invalid on the grounds that it substituted the Legislature's judgment for the Birmingham City Council's about the optimal balance between employers' and employees' needs? As explained below, the amended complaint presents many other questions like this, such as: Which facially race-neutral policies constitute "racial" issues for purposes of the political-process doctrine? And will *any* relevant racial disparity suffice to establish that a law has racially disparate effects? This list could go on and on. And that simple fact provides a big clue about the implausibility of the plaintiffs' claims.

Fortunately, however, the Court need not wrestle with these questions. This is because the Court lacks jurisdiction to wrestle with them even if it wanted to. Article III of the Constitution produces this result as to the Attorney General Strange, the City of Birmingham, and Mayor Bell because none of these defendants actually enforce the Minimum Wage Act. And the Eleventh Amendment to the Constitution produces this result as to the State of Alabama because it is that Amendment's main job to keep nonconsenting States out of lawsuits like this.

The plaintiffs devote over forty-five pages of their opposition brief towards defending the validity of their claims. But as explained below, nothing they have said in those pages is persuasive. The Court should accordingly dismiss the amended complaint in its entirety, and thereby save the State Defendants from the high costs and substantial burdens of an unnecessary and unwarranted lawsuit.

## I.   The Court lacks jurisdiction to entertain the plaintiffs' claims.

To begin, nothing the plaintiffs have said establishes the Court's jurisdiction. In moving to dismiss, the State Defendants emphasized that neither Attorney General Strange nor the City of Birmingham nor Mayor Bell play any role in enforcing the Minimum Wage Act—a fact which means two things for purposes of Article III standing: (1) that those defendants are not *causing* the plaintiffs' injury and (2) that no injunction against those defendants could *redress* the plaintiffs' injury. *See* doc. 30 at 8-11. Meanwhile, the State of Alabama explained why it is absolutely immune from the plaintiffs' Voting Rights Act claim—the one and only claim on which it has been sued. *See id.* at 11-12. Taken together, these things mean that there are no proper defendants in the case and that the Court, accordingly, lacks jurisdiction to proceed in any respect.

### A.   The plaintiffs lack standing to sue Attorney General Strange, the City of Birmingham, and Mayor Bell.

On the standing question, the plaintiffs rely almost exclusively on the principle that a plaintiff may sue a "middle man" to his or her injury—i.e., someone whose action has a "'determinative or coercive effect'" upon some other, more proximate actor. Doc. 30 at 6 (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)). Lost in the plaintiffs' lengthy explanation of this principle, however, is any reason to believe that it actually applies here. *Bennett v. Spear*, for example, certainly does not support jurisdiction. In that case, the Supreme Court allowed plaintiffs to sue the U.S. Fish and Wildlife Service Director over one of the Service's "biological opinions"

because the opinion had a "virtually determinative effect" on the Bureau of Reclamation, which, in turn, would "abide" by that opinion and directly injure the plaintiffs. 520 U.S. at 167, 170. But in this case, there is just the Minimum Wage Act and its direct effect on the individual plaintiffs' employers and the state courts who will enforce it: There is no analogous intermediate action by Attorney General Strange, the City of Birmingham, or Mayor Bell. The City Defendants, who if anything should be re-aligned as plaintiffs here, *see* doc. 30 at 17-18, are merely "not enforcing" the City's own minimum-wage ordinance because of Act 2016-18. Doc. 18, ¶ 16; *see also id.* ¶ 17. And Attorney General Strange at most made public statements about *Birmingham*'s ordinance—before the Minimum Wage Act even became law—and about the Legislature's constitutional preemption power. *See id.* ¶¶ 13-14. These are hardly official actions that have a "determinative or coercive effect" on the private employers who have a direct relationship to the individual plaintiffs. *Bennett*, 520 U.S. at 169.

   *Bennett* in fact supports dismissal. This is because *Bennett* reiterated that "it does *not* suffice if the injury complained of is 'th[e] result [of] the *independent* action of some third party not before the court.'" *Id.* at 169 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (first emphasis added)). The operative provisions of the Minimum Wage Act are its self-executing preemption clauses: If an employee sues his or her employer to comply with Birmingham's minimum-wage ordinance, then that employer may raise the Minimum Wage Act's preemption clauses as a defense and the Alabama courts will enforce those clauses (or not) regardless of whatever actions a public entity takes or does not take. *See* doc. 10-1 at 4, 8 (Ala. Act No. 2016-18, §§ 2(c), 6(d)).[1] This, ultimately, is why the Eleventh Circuit's decision in *Doe v. Pryor*, 344 F.3d 1282 (11th Cir. 2003), forecloses jurisdiction: Where, as here, a plaintiff's inju-

---

[1] In this brief, page references are to CM/ECF page numbers as opposed to a document's native pagination.

ries "stem from a state court . . . proceeding in which the [Alabama] Attorney General play[s] no role," a Rule 12(b)(1) dismissal is appropriate because the injuries "are not 'fairly traceable' to" the Attorney General and "also are not redressable through [a] lawsuit against [him]." *Id.* at 1285.

The plaintiffs attempt to distinguish *Doe v. Pryor*, but their argument is unpersuasive. It is true, as the plaintiffs say, that the Alabama Attorney General conceded the unconstitutionality of the particular statute at issue in that case. But as the Court expressly confirmed, this fact played no role in the controlling causation and redressability analysis on which the State Defendants rely: "It's not just a matter of the wrong defendant," the Court wrote. *Id.* at 1286. "The federal courts cannot make it likely that the Alabama courts will redress [the plaintiff's] injuries, no matter who is named as defendant in this suit." *Id.* Concomitantly, "[t]he flaw in [the *Doe v. Pryor* plaintiff's] reasoning is its premise that our decisions bind the Alabama courts to decide cases in accordance with them. They do not. The only federal court whose decisions bind state courts is the United States Supreme Court." *Id.* (citing cases).

The same analysis applies here. It is private employers and the Alabama courts who will decide whether the Minimum Wage Act controls the wages payable to employees in the City of Birmingham. It is thus private employers and the Alabama courts who are causing (or who will cause) any injury to the plaintiffs. For these reasons, when it comes to Attorney General Strange, the City of Birmingham, and Mayor Bell, the Court lacks subject-matter jurisdiction for want of standing.

**B.     The plaintiffs' claims against the State of Alabama are barred by sovereign immunity.**

On sovereign immunity, the plaintiffs are misstating things when they claim that the State of Alabama "concede[d]" the absence of "a single precedent supporting [its] Eleventh Amend-

ment defense." Doc. 40 at 17. To the contrary, the State cited multiple Supreme Court precedents establishing that (1) in general, "nonconsenting States may not be sued by private individuals in federal court," *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001); (2) Alabama has not consented to this or any other suit, *Alabama v. Pugh*, 438 U.S. 781, 782 (1978); (3) Alabama thus can be sued by these plaintiffs only if Congress has "ma[de] its intention [to abrogate Alabama's immunity] *unmistakably clear* in the language of the [Voting Rights Act]," *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254 (2011) (emphasis added); and (4) even an express "general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment," *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 246 (1985). Each of these cases supports Alabama's Eleventh Amendment defense under Section 2 of the Voting Rights Act.

What the plaintiffs presumably are referring to is the State's acknowledgment of three nonbinding decisions holding, with virtually no discussion, that Congress abrogated the States' sovereign immunity on the face of Section 2. The original case in this trio is *Mixon v. Ohio*, 193 F.3d 389 (6th Cir. 1999)—a case the Middle District of Louisiana later merely cited, without elaboration, as having conclusively resolved the issue.[2] *See Hall v. Louisiana*, 983 F. Supp. 2d 820, 829-30 (M.D. La. 2013); *Terrebonne Parrish NAACP v. Jindal*, 154 F. Supp. 3d 354, 359 (M.D. La. 2015). In *Mixon*, however, "the Ohio Attorney General ha[d] not [even] pressed the immunity question on appeal." 193 F.3d at 397. Perhaps as a result, the sum total of *Mixon*'s abrogation analysis consisted of a single, two-sentence paragraph:

> With respect to whether Congress intended to abrogate the States' sovereign immunity under the Voting Rights Act, we believe the language and purpose of the statute indicate an affirmative response. The language of Section 2 of the Act, 42

---

[2] The Middle District of Louisiana also cited *Reaves v. U.S. Dep't of Justice* for this proposition, but *Reaves* was a case under *Section 5* of the Voting Rights Act, not Section 2. *See* 355 F. Supp. 2d 510, 515-16 (D.D.C. 2005).

U.S.C. § 1973 [now 52 U.S.C. § 10301], specifically prohibits "any State or political subdivision" from discriminating against voters on the basis of race.

*Id.* at 398. The problem with this is that it does not even begin to identify any "unequivocal statutory language" indicating Congress's desire to abrogate the States' immunity. *Atascadero State Hosp.*, 473 U.S. at 246. It just repeats a phrase from Section 2's general prohibition against discriminatory voting practices:

> No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied *by any State or political subdivision* in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color.

52 U.S.C. § 10301(a) (emphasis added). That language describes what is prohibited under Section 2. But it says nothing about whether someone may sue the States themselves to enforce it. In fact, Section 2 is routinely enforced through suits against state officials under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908). There is thus no reason, let alone an "unmistakably clear" one, to believe that Section 2's mere reference to States means to abrogate their immunity. *Va. Office for Prot. & Advocacy*, 563 U.S. at 254.

Without an unmistakably clear abrogation in the text of Section 2, the plaintiffs resort to rehashing the arguments supporting an implied private cause of action to enforce that Section. *See* doc. 40 at 17-18. (Contrary to the plaintiffs' assertion, *see id.* at 17, it *is* only an implied cause of action because courts must infer it; the text of Voting Rights Act is not direct on this point.) Alabama does not dispute that these private plaintiffs may sue someone to enforce Section 2. But that proposition does not itself determine *who* they may sue to do so, and in the absence of "unequivocal statutory language" authorizing this suit against Alabama, the plaintiffs must look to other potential defendants for recourse. *Atascadero State Hosp.*, 473 U.S. at 246.

"While private rights of action may be implied," that is, "waivers of sovereign immunity may not." *Dorsey v. U.S. Dep't of Labor*, 41 F.3d 1551, 1555 (D.C. Cir. 1994).

## II.   The complaint fails to state a valid claim on the merits.

If the Court decides that it has jurisdiction, it should dismiss on the merits. As the State Defendants explained before, the plaintiffs' claims fall into two categories: (1) those that assert a more conventional claim of racial discrimination under the Equal Protection Clause and (2) those that assert a novel theory (mostly under provisions other than the Equal Protection Clause) in an attempt to plead around the deficiencies in their more conventional claims. Either way, nothing the plaintiffs have said justifies letting this case proceed to discovery in any respect.

### A.   The Minimum Wage Act does not discriminate based on race in any conventional sense.

For starters, the amended complaint does not state a valid claim under any conventional theory of racial discrimination. This is to say that the Minimum Wage Act does not *facially* discriminate based on race—which is really what their political-process claim comes down to. And nor does the Minimum Wage Act *effectively* discriminate based on race because it is plausibly neither the product of purposeful racism by the entire Alabama Legislature nor a law that has racially disparate effects. Because neither of these approaches has any potential merit, the Court should dismiss any and all claims based on them.

#### 1.   The law does not **facially** *discriminate based on race (Count IX).*

In moving to dismiss, the State Defendants explained why, under *Schuette v. Coalition to Defend Affirmative Action*, 572 U.S. ___, 134 S. Ct. 1623 (2014), the political-process doctrine is now just a variant of the unremarkable equal-protection principle requiring close scrutiny of facially discriminatory statutes, a description plainly inapplicable to the Minimum Wage Act. *See* doc. 30 at 22. Any broader reading of the doctrine would raise the very problem posed by this

7

lawsuit—what Justice Kennedy's plurality opinion described as the absence of any "limiting standards" about what constitutes a "racial" issue. *Id.* at 1635. *Schuette* involved university admissions policies, but that issue would join "[t]ax policy, housing subsidies, *wage regulations*, and even the naming of public schools, highways, and monuments" as "just a few examples of what could become . . . beyond the power of a legislature to decide when enacting limits on the power of local authorities or other governmental entities to address certain subjects." *Id.* (emphasis added).

The plaintiffs claim that "there is no consensus on how the *Schuette* plurality opinion changed or limited the holdings in [the Supreme Court's prior political-process decisions]." Doc. 40 at 42. But even Justice Sotomayor's dissent read that opinion as the State Defendants do, criticizing it for making the doctrine "about nothing more than the intentional and invidious infliction of a racial injury." 134 S. Ct. at 1664 (Sotomayor, J., dissenting). The plurality opinion, moreover, plainly "constitute[s] the holding of the Court and provide[s] the governing standards" for the political-process doctrine going forward. *Marks v. United States*, 430 U.S. 188, 194 (1977). Recall that Justices Scalia and Thomas "agree[d] with those parts of the plurality opinion that repudiate[d] this doctrine" and in fact thought that the political-process cases "should have been overruled." *Schuette*, 134 S. Ct. at 1640, 1643 (Scalia, J., concurring in the judgment). That makes Justice Kennedy's opinion—on behalf of himself, Chief Justice Roberts, and Justice Alito—the "'position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Id.* at 193 (quoting *Gregg v. Georgia*, 428 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). In other words, Justice Kennedy's opinion is the law, and as explained before, it forecloses the plaintiffs' claim. *See* doc. 30 at 14-15.

Having said that, the plaintiffs' claim is implausible even under Justice Sotomayor's much more generous interpretation of the political-process doctrine. Under even her view, for example, there is no violation unless the challenged government action "has a racial *focus*, targeting a policy or program that 'inures *primarily* to the benefit of the [racial] minority.'" *Schuette*, 134 S. Ct. at 1659 (Sotomayor, J., dissenting) (quoting *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 472 (1982) (emphasis added)). Contrary to the plaintiffs' request for discovery, Justice Sotomayor would not have required a "factual record" in this case. Doc. 40 at 45. In *Schuette*, her analysis of this element turned only on what was "clear from [the challenged provision's] text." 134 S. Ct. at 1659 (Sotomayor, J., dissenting). More importantly, she reaffirmed that the doctrine is implicated by reallocations of power that "'deal[] *in explicitly racial terms* with legislation designed to benefit minorities *as minorities*, not legislation intended to benefit some larger group of underprivileged citizens among whom minorities were disproportionately represented.'" *Id.* at 1674 (quoting *Seattle*, 458 U.S. at 485 (emphasis added)). Justice Sotomayor even expressly sanctioned legislation like the Alabama law at issue here, noting that "[Michiganders] were . . . free to remove from the [university] boards the authority to make *any* decisions with respect to admissions policies, as opposed to only decisions concerning race-sensitive admissions policies." *Id.* at 1670 (emphasis added).

Unlike the expressly "race-sensitive" policy at issue in *Schuette*, Alabama's Minimum Wage Act, does not on its face "draw[] a racial distinction." *Id.* at 1674. It thus does not plausibly violate the political-process doctrine under any interpretation of that doctrine, let alone Justice Kennedy's controlling one. To hold otherwise would be to transform a doctrine in search of limits into a doctrine with no limits at all.

2.      *The law does not* **effectively** *discriminate based on race (Counts VII, VIII).*

The plaintiffs' claim that the Minimum Wage Act *effectively* discriminates based on race also suffers from a lack of limiting principles. Take their view of the Act's effects. Although the Act applies by its terms statewide, the plaintiffs insist that "[i]t is enough" to allege a racial disparity among the specific class of workers who have missed out on the wage-hike promised by Birmingham's now-preempted ordinance. Doc. 40 at 34. But if that is enough, what else would be? A racial disparity among minimum-wage workers in some other city, such as Montgomery or Mobile? In a particular Birmingham neighborhood as defined by the plaintiffs' lawyers? No; courts should examine the effects of a challenged government decision on its own terms, which in this case is statewide. And contrary to the plaintiffs' argument (*see* doc. 40 at 34), that is precisely the approach the Supreme Court took in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977): A town refused to rezone a piece of land that would be used to build a low-income housing development; the Court found a discriminatory effect because blacks were disproportionately likely to be eligible *for that particular development*. *See id.* at 259, 269. Here, of course, there is no allegation that black workers are disproportionately likely to be affected by the Minimum Wage Act within its entire, statewide ambit. Thus, the Court should dismiss the plaintiffs' claims on the discriminatory-effects prong alone.[3]

Consider, too, the plaintiffs' allegations on the other essential element of this claim: discriminatory motive. The plaintiffs list seven categories of allegations that they say validate their claim in this respect. *See* doc. 40 at 35-36. But if these allegations suffice, it is unclear what re-

---

[3] The plaintiffs say that they have alleged a statewide effect, but the only allegation they cite for this proposition states that "[s]tatewide, the wage gap between white and black workers is even greater than in Birmingham, with white wage workers earning, on average, $2.12 more than black wage workers for each our worked." Doc. 40 at 33 (quoting doc. 18, ¶ 30). Even if true, this allegation does say whether more black workers than white workers earn the minimum wage in Alabama. It thus does not identify any effect of the Minimum Wage Act.

cently enacted Alabama law would not be subject to invalidation. Or at least it unclear why the validity of a law like the Minimum Wage Act should turn on the racial composition of the municipality whose ordinance is affected first. Not surprisingly in light of problems like these, the Court can and should dismiss the plaintiffs' claims on the discriminatory-motive prong as well.

The plaintiffs' most fundamental errors on this issue lie at the conceptual level. They reject the "clearest proof" standard applicable to their claim, but the Supreme Court articulated that standard precisely to guide "[j]udicial inquiries into [legislative] motives." *Flemming v. Nestor*, 363 U.S. 603, 617 (1960). In doing so, the Court did not limit the standard to a particular type of constitutional claim or a particular type of challenged statute. *Cf.* doc. 40 at 37-38. Regardless, the Supreme Court has noted the considerable "difficulties in determining . . . actual motivations" in precisely the kind of case as this one, a race-based equal protection challenge to a state statute. *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). The plaintiffs act as if an intentional-racism claim simply "cannot be resolved on a motion to dismiss," doc. 40 at 40-41, but that is wrong. The leading Supreme Court decision on the Rule 12(b)(6) dismissal standard, *Ashcroft v. Iqbal*, itself required dismissal of a discriminatory-purpose claim. *See* 556 U.S. 662, 682 (2009). And *Iqbal* concerned the motive of two individual government actors—a circumstance in which it should no doubt be even easier to allege a discriminatory motive.

Turning to the particular allegations at issue in this case, the plaintiffs' claim fares no better. The plaintiffs effectively concede that their complaint identifies no *direct* evidence of racism and that they are instead relying exclusively on circumstantial evidence of such a motive. *See* doc. 40 at 34-35. But on this front, they merely rehash the various categories of allegations they have made—"Alabama's long history of official actions taken for invidious purposes," "racially polarized voting in Alabama," and so on. *Id.* at 35-36. As the State Defendants

previously demonstrated, the plaintiffs' allegations erroneously exalt quantity over quality: The point is not that their allegations about the State's racial history, racially polarized voting, etc. have *no* probative value, but rather that each of them has extremely little probative value—so little value that, taken together, they do not add up to a plausible claim of intentional racism. *See* doc. 30 at 24-28. With one major exception, the plaintiffs simply do not explain how their laundry list of allegations actually "nudge[s] [their] claims . . . across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680 (internal quotation marks, citation omitted).

The one major exception has to do with the legitimacy of Alabama's interests in enacting the Minimum Wage Act. Aware that this factor can provide powerful evidence *negating* any inference of purposeful racism, *see* doc. 30 at 25, the plaintiffs devote a substantial portion of their argument to drawing fine distinctions between the Act and other preemption statutes or between the Act and similar laws enacted in other States. *See* doc. 40 at 38-39. But these distinctions are too fine. They do not overcome the State's judicially recognized interest in maintaining uniform employment policies. *Cf. New Orleans Campaign for a Living Wage v. City of New Orleans*, 825 So. 2d 1088, 1105-06 (La. 2002). And they do not overcome the State's research-backed interest in maintaining the minimum wage at a reasonable rate. *See, e.g.*, Debra Burke, et al., *Minimum Wage and Unemployment Rates: A Study of Contiguous Counties*, 46 GONZ. L. REV. 661, 672-76 (2011) (surveying various economic studies). As a result, the plaintiffs' arguments on this point do not suffice to validate their claims of intentional racial discrimination. The Court should dismiss them.

### B. The Minimum Wage Act does not discriminate based on race under any of the amended complaint's novel legal theories.

Just as the Court should dismiss the plaintiffs' more conventional theories, it should also dismiss the plaintiffs' unconventional claims. The plaintiffs expressly concede that their claim

under the Fourteenth Amendment's Privileges or Immunities Clause (count 3) is foreclosed by Supreme Court precedent. *See* doc. 40 at 53. Thus, this section reiterates why the Minimum Wage Act does not violate voting rights (counts one and four); or unconstitutionally "perpetuate" Alabama's de jure policies of racial discrimination (counts two and six); or run afoul of the Thirteenth Amendment's ban on slavery and involuntary servitude (count five).

In evaluating these claims, the Court should especially consider a very recent Sixth Circuit decision. While the parties were briefing the State Defendants' motion to dismiss, a unanimous Sixth Circuit panel released its decision in *Phillips v. Snyder*, ___ F.3d ___, No. 15-2394, 2016 WL 4728026 (6th Cir. Sept. 12, 2016). In *Phillips*, the Court upheld a Michigan law allowing for the temporary appointment of "emergency managers" in a financially distressed municipality or local school system whose "powers . . . are extensive and arguably displace *all of those* of the local governmental officials" for the duration of the financial emergency. 2016 WL 4728026 at *1 (emphasis added). Relevant here, the Court affirmed the Rule 12(b)(6) dismissal of the plaintiffs' complaint, including claims, like those here, under Section 2 of the Voting Rights Act and the Thirteenth Amendment. *See id.* at *9-*10.

### 1.      *The law does not implicate voting rights (Counts I, IV).*

The plaintiffs' arguments that the Minimum Wage Act implicates voting rights under either Section 2 of the Voting Rights Act or the Fifteenth Amendment are self-defeating on their face. For example, their quotations from *Presley v. Etowah County Commission*, 502 U.S. 491 (1992), support the proposition that reallocations of government authority do *not* have the requisite relation to voting. *See* doc. 40 at 24-25. They rely on *Hardy v. Wallace*, 603 F. Supp. 174 (N.D. Ala. 1985) (three-judge court), a non-binding district-court decision which they admit was limited to "'its peculiar facts.'" Doc. 40 at 25 (quoting 603 F. Supp. at 179). And *they rely*

on *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), a case they admit deprived "'colored citizens, and only colored citizens,'" of the right to actually cast a ballot in municipal elections. Doc. 40 at 31 (quoting 364 U.S. at 347). In short, the plaintiffs have presented no reason to believe that a preemption law like the Minimum Wage Act, which removes one tiny slice of local authority, has any affect whatsoever on their right to cast an effective ballot.

It is true, as the plaintiffs argue, that *Presley* construed Section 5 of the Voting Rights Act instead of Section 2. But as the Sixth Circuit recently explained, "[*Presley*'s] reasoning applies *a fortiori* to the § 2 claim here":

> [T]he § 5 language that the Supreme Court focused upon in *Presley* was "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting," language indistinguishable from that of § 2 ("voting qualification or prerequisite to voting, or standard, practice, or procedure . . . [resulting] in a denial or abridgement of the right . . . to vote . . ."). The *Holder* Court, in distinguishing § 2 and § 5, held that "we do not think that the fact that a change in a voting practice must be precleared under § 5 necessarily means that the voting practice is subject to challenge in a dilution suit under § 2." [512 U.S. at 883.] In other words, for purposes of interpreting these words, § 5 if anything is *broader* than § 2.

*Phillips*, 2016 WL 4728026 at *9. The Sixth Circuit in fact identified a further threshold reason to dismiss any voting-rights claim here: If Section 2 does not apply to "changing the selection of [a governing body] from an elective system to an appointive one," then it surely does not cover a law like the Minimum Wage Act. *Id.* (citing *Mixon v. Ohio*, 193 F.3d 389, 394 (6th Cir. 1999)).

### 2. *The law cannot violate the Equal Protection Clause on a vestiges or perpetuation theory (Counts II, VI).*

The plaintiffs' claims based on a "vestiges" or "perpetuation" theory can be disposed of in short order. Here, the plaintiffs fail to come to grips with how the Eleventh Circuit's en banc decision in *Johnson v. Governor of Florida*, 405 F.3d 1214 (2005) (en banc), defeats this claim. Most fundamentally, they ignore the distinction *Johnson* noted between *liability* for a constitu-

tional violation, on one hand, and "what *remedy* the Constitution requires after a State has already been found liable for violating the Constitution," on the other. 405 F.3d at 1225 n.22. "[H]ere the question is one of liability, not remedy," *id.*—a fact that renders the plaintiffs' cited case, *United States v. Fordice*, 505 U.S. 717 (1992), entirely inapplicable. As explained before, ignoring this distinction would be to sanction a workaround of the existing and well-settled limits on the Supreme Court's equal-protection jurisprudence. *See* doc. 30 at 30. With creative lawyering, there would be no end to the list of policies that might now be considered "traceable" to past discrimination and thus constitutionally suspect.

In any event, *Johnson* demonstrates why the plaintiffs are also wrong to view the Minimum Wage Act as a vestige or perpetuation of *de jure* racial discrimination at all. The en banc Eleventh Circuit explained why "valid public policy reason[s]," the passage of time since the prior *de jure* discrimination, and only "minor" racial effects all distinguished Florida's felon-disenfranchisement provision from the true vestiges of *de jure* discrimination that the *Fordice* Court found so troubling. 405 F.3d at 1225-27. Here, the distinctions are even more stark because *there is no* "prior" *de jure* discrimination—let alone one that is "proxim[ate] in time" to the Minimum Wage Act or that has any significant racial effects. *Id.* at 1226. For example, the plaintiffs argue that "[t]he Alabama Constitution of 1901, with its racially motivated anti-home rule provisions, remains in place today." Doc. 40 at 47. But this ignores that nothing in the current Alabama Constitution prohibits local governments from setting local employment policies: The fact that local governments up until recently enjoyed this power is why the Minimum Wage Act exists at all.

### 3.      The law does not implicate the Thirteenth Amendment (Count V).

Similarly, not much needs to be said with respect to the plaintiffs' Thirteenth Amendment claim. Read properly, that Amendment by itself reaches only slavery or involuntary servitude, and it takes Congressional action under Section 2 of the Amendment to address so-called "badges" or "incidents" of slavery. *See* doc. 30 at 32-33. Of course, the plaintiffs implicitly admit that they are not complaining of any "use or threatened use of physical or legal coercion." *United States v. Kozminski*, 487 U.S. 931, 944 (1988). And they expressly admit that they are relying only on the "'self-executing' command of the Thirteenth Amendment itself." Doc. 40 at 52 (quoting *Kozminski*, 487 U.S. at 942). These admissions thus can and should resolve the claim in the State Defendants' favor.

In any event, the Court need not agree with the State Defendants about the outer limits of the Thirteenth Amendment's "self-executing" part to grant dismissal at this stage. As the Sixth Circuit recently pointed out, *see Phillips*, 2016 WL 4728026 at *10, claims like the present one are foreclosed by *City of Memphis v. Greene*, 451 U.S. 100 (1981). There, the Court upheld a city's street closure even though it had the effect of segregating races within the city. *See* 451 U.S. at 102. The Court held that this action would not violate the Thirteenth Amendment even if the Amendment does by itself prohibit the badges and incidents of slavery. The reason? The City had legitimate interests sufficient, in the Sixth Circuit's telling, to deprive the street closure of a "sufficiently direct connection to race." *Phillips*, 2016 WL 4728026 at *10.

That same analysis applies here. The Minimum Wage Act, just like Michigan's appointment of emergency managers for financially distressed communities was "passed by state-elected bodies for which African-Americans have a constitutionally protected equal right to vote" and is "facially entirely neutral with respect to race." *Id.* It thus is "far removed from being a 'badge' of the extraordinary evil of slavery." *Id.*

## CONCLUSION

For the foregoing reasons, and those expressed previously, the Court should dismiss the amended complaint, in its entirety, either for lack of jurisdiction or failure to state any valid claim.

Respectfully submitted,

Luther Strange (ASB-0036-G42L)
   *Attorney General*

s/William G. Parker, Jr.
James W. Davis (ASB-4063-I58J)
   *Deputy Attorney General*
William G. Parker, Jr. (ASB-5142-I72P)
   *Assistant Attorney General*

State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130
(334) 242-7300
jimdavis@ago.state.al.us
wparker@ago.state.al.us

***Counsel for the State of Alabama &
Attorney General Strange***

**CERTIFICATE OF SERVICE**

I certify that on September 21, 2016, I filed the foregoing document electronically via the

Court's CM/ECF system, which will send a copy to all counsel of record.

 s/William G. Parker, Jr.
*Attorney for the State of Alabama &*
*Attorney General Strange*