## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **MARNIKA LEWIS, et al.,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:16-CV-690-RDP** |
| | } | |
| **ROBERT J. BENTLEY., et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on (1) Defendant Mayor William A. Bell, Sr.'s Motion to Dismiss (Doc. # 28), and (2) the Motion To Dismiss filed by the State Of Alabama and Attorney General Strange (Doc. # 30).  The State Defendants' Motion has been fully briefed.  (Docs. # 40, 43, 44, 50 and 51).

At issue in this case is the tug of war between the State of Alabama and the City of Birmingham (and others) over the authority to establish a minimum wage.  Plaintiffs have painted this dispute as yet another chapter in Alabama's civil rights journey.  Defendants disagree and frame it as a simple matter of ensuring consistency in how employers operating within the state are treated.  After careful review, the court concludes there are fatal flaws affecting Plaintiffs' claims: (1) they have not sued the correct Defendants (*i.e.*, they have not included the appropriate characters in their "painting)," and this affects their standing to pursue certain of their claims; (2) they have failed to state a claim under Section 2 of the Voting Rights Act; (3) their Section 2 claim is also barred by the Eleventh Amendment; (4) their equal protection claim has not been plausibly pled; (5) their Thirteenth and Fifteenth Amendment

claims necessarily fail; and (6) they are not entitled to go forward on their race discrimination or "political process" claims.

I.     **Background**

For over a century, the Alabama courts have recognized that cities in Alabama are "mere creatures of the legislative power, established as political agencies for the more convenient administration of local government, with such powers . . . as the [legislature] may, from time to time, see fit to confer." *Hare v. Kennerly*, 3 So. 683, 684 (Ala. 1888) (citing *Meriwether v. Garrett*, 102 U.S. 472 (1880)). Alabama municipalities are subject to what is essentially a state version of the Supremacy Clause prohibiting them from "pass[ing] any laws inconsistent with the general laws of [the] state." Ala. Const. art. IV, § 89; *see also* Ala. Code § 11-45-1 (authorizing cities to "adopt ordinances" except as "inconsistent with the laws of the state").

The federally mandated minimum wage is currently $7.25 per hour. 29 U.S.C. § 206(a)(1)(C). Congress last adjusted the minimum wage in 2007.  29 U.S.C. § 206 (a).  In April 2015, the Birmingham City Council adopted a resolution urging the Alabama Legislature to exceed the federal minimum wage on a statewide basis. (Doc. # 18, ¶ 82).  When the Legislature did not act, the Birmingham City Council responded with a series of ordinances first enacting, and later expediting, a local minimum wage of its own. (Doc. #  18, ¶¶ 21, 24-25, 85, 90-92). Various state legislators then proposed bills that would require statewide adherence to the federal minimum wage.  In the 2016 regular session -- just as Birmingham's ordinance was set to go into effect -- the Legislature enacted the Alabama Uniform Minimum Wage and Right-to-Work Act at issue in this lawsuit ("Act 2016-18" or "the Act"). *See* Ala. Act No. 2016-18, *provisionally codified* at Ala. Code §§ 25-7-40 *et seq*. The purpose of the Act was to "ensure that [labor] regulation and policy is applied uniformly throughout the state." Act No. 2016-18, § 6(a). The

Act further establishes the Legislature's "complete control" over not only minimum wage policy, but also other issues such as "collective bargaining under federal labor laws," and "the wages, leave, or other employment benefits provided by an employer" to its employees. *Id*.  The Act parallels similar legislation adopted in at least sixteen other states prohibiting localities from enacting their own minimum wage ordinances.

Plaintiffs principally allege that Act 2016-18 has the purpose and effect of transferring control over minimum wages and all matters involving private sector employment in the City of Birmingham from municipal officials elected by a majority-black local electorate to legislators elected by a statewide majority-white electorate.  They further contend that Act 2016-18 was enacted with the intent of discriminating against the people who live and work in the City of Birmingham on the basis of race in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, as well as the Thirteenth, Fourteenth, and Fifteenth Amendments to the Constitution of the United States.

The Amended Complaint names as Defendants the State of Alabama, Luther Strange in his official capacity as Attorney General, the City of Birmingham, and William Bell in his official capacity as Mayor of Birmingham.  It contains the followings counts:

1.      Count I: Violation of § 2 of the Voting Rights Act: Results Standard

2.      Count II: Perpetuation of Alabama's *de jure* Policy of Maintaining White Control over Local Black Majorities in Violation of the Equal Protection Clause.

3.      Count III: Perpetuation of Alabama's *de jure* Policy of Maintaining White Control over Local Black Majorities in Violation of the Privileges or Immunities Clause.

4.      Count IV: Perpetuation of Alabama's *de jure* Policy of Maintaining White Control over Local Black Majorities in Violation of the Fifteenth Amendment.

5.      Count V: Perpetuation of Alabama's *de jure* Policy of Maintaining White Control over Local Black Majorities in Violation of the Thirteenth Amendment.

6.      Count VI: Vestiges of *de jure* Racial Segregation in Violation of the Equal Protection Clause.

7.      Count VII: Intentional Racial Discrimination in Violation of § 2 of the Voting Rights Act and the Thirteenth, Fourteenth, and Fifteenth Amendments.

8.      Count VIII: Racially-Motivated Enactment of Act 2016-18 Violates the Equal Protection Clause of the Fourteenth Amendment.

9.      Count IX: Equal Protection Claim Based on the Political Process Doctrine.

(Doc. # 18).

After careful review, and for the reasons stated below, the court concludes that Defendants are entitled to judgment as a matter of law on Plaintiffs' claims.

## II.      Standard of Review

The Federal Rules of Civil Procedure require only that the complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, the complaint must include enough facts "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Pleadings that contain nothing more than "a formulaic recitation of the elements of a cause of action" do not meet Rule 8 standards, nor do pleadings suffice that are based merely upon "labels and conclusions" or "naked assertion[s]" without supporting factual allegations. *Twombly*, 550 U.S. at 555, 557. In deciding a Rule 12(b)(6) motion to dismiss, courts view the allegations in a complaint in the light most favorable to the non-moving party. *Watts v. Fla. Intl. Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007).

To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although "[t]he

plausibility standard is not akin to a 'probability requirement,'" the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A plausible claim for relief requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to support the claim. *Twombly*, 550 U.S. at 556.

In considering a motion to dismiss, a court should "1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Kivisto v. Miller, Canfield, Paddock & Stone, PLC*, 413 Fed. Appx. 136, 138 (11th Cir. 2011) (quoting *Am. Dental Assn. v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010)). That task is context specific and, to survive the motion, the allegations must permit the court based on its "judicial experience and common sense . . . to infer more than the mere possibility of misconduct." *Twombly*, 550 U.S. at 556. Further, "courts may infer from the factual allegations in the complaint 'obvious alternative explanation[s],' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Am. Dental*, 605 F.3d at 1290 (quoting *Iqbal*, 556 U.S. at 682). If the court determines that well-pleaded facts, accepted as true, do not state a claim that is plausible, the claims are due to be dismissed. *Twombly*, 550 U.S. at 556.

## III. Analysis

The court will first take up Mayor Bell's Motion, to which no opposition has been filed. The court will then address the overarching standing issues relevant to all claims in this case, examine each individual claim, and discuss the specific issues applicable to each of the claims.

### A. Mayor Bell's Motion to Dismiss

In the Amended Complaint, Plaintiffs state:

> The City of Birmingham and Mayor Bell are named as defendants only for the purpose of providing complete relief among the parties with respect to the claims raised herein.

(Doc. # 18 at ¶ 18). Plaintiffs have indicated that Mayor Bell is a party because he "has not acted to enforce Ordinance 16-28[1] because of Act 2016-18." (Doc. # 18 at ¶ 17). Similarly, they have sued the City due to its non-enforcement of "Ordinance 16-28 because of Act 2016-18." (Doc. # 18 at ¶ 16). Mayor Bell is only named in the Amended Complaint in his official capacity. He seeks dismissal of the claims against him as duplicative of the claims against the City. Plaintiffs have not opposed Mayor Bell's Motion.

"Official-capacity suits ... 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. New York City Dep't of Soc. Servs*., 436 U.S. 658, 690 n. 44 (1978)). Thus, "[b]ecause suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials, because local government units can be sued directly ... ." *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991). Upon review, the court finds that Plaintiffs' claims against Mayor Bell are entirely duplicative of Plaintiffs' claims against the City. (Doc. # 18 at 8). Permitting Plaintiffs to pursue claims against both the City and Mayor Bell in his official capacity in this case would be redundant and needlessly confusing. *See Busby*, 931 F.2d at 776. Therefore, Mayor Bell's Motion to Dismiss is due to be granted.

**B.    Plaintiffs Lack Article III Standing (All Counts Against Attorney General Strange, Mayor Bell and the City of Birmingham)**

Standing to sue is a doctrine rooted in the traditional understanding of the case or

---

[1] On August 18, 2015, the Birmingham City Council unanimously passed, with one abstention, Ordinance 15-124 that would raise the minimum wage for employees working in the city to $8.50 per hour as of July 1, 2016, and $10.10 per hour on July 1, 2017. Ordinance 16-28 moved the effective date of the minimum wage increase to February 24, 2016 and increased the minimum wage to $10.10.

controversy requirement. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The doctrine delimits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong. *Id.* (citing *Valley Forge Christ. College v. Am. United for Separation of Church and State, Inc.*, 454 U.S. 464, 473 (1982); *Warth v. Sedlin*, 422 U.S. 490, 498-99 (1975)). To bring suit in federal court, a plaintiff must establish three elements as to each defendant: (1) an injury in fact—that is, an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of—in other words, the injury must be fairly traceable to the challenged action of Defendants, and not the result of the independent action of some third party not before the court; and (3) a likelihood, as opposed to a merely speculative chance, that the injury will be redressed by a favorable decision of the court. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-62 (1992). "Failure to establish any one [of the three standing elements] deprives the federal courts of jurisdiction to hear the suit." *Rivera v. Wyeth–Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002); *see also Delta Commercial Fisheries Association v. Gulf of Mexico Fishery Management Council*, 364 F.3d 269, 273 (5th Cir. 2004).

The Motion to Dismiss currently before the court was filed by the State of Alabama and Attorney General Strange. These Defendants argue that the conclusory allegations of the Amended Complaint do not show how Defendants' actions affected, or even could affect, Plaintiffs' pay. [2] The court addresses each standing element below.

---

[2] Moreover, Defendants assert that the City of Birmingham has not caused Plaintiffs any injury. Rather, this is a situation in which its city ordinance became inoperative as a result of Act 2018-18. Apparently recognizing these facts, Plaintiffs state that the City Defendants are included in the Amended Complaint "only" for purposes of the "relief" sought. (Doc. # 18, ¶ 18). Nonetheless, the City will be included in the court's analysis.

### 1.      Element One: Injury-in-Fact

Plaintiffs contend that they -- and in the case of the organizational Plaintiffs, their members -- have suffered an injury in fact because they are being paid less than the minimum wage the City has adopted.  Injury-in-fact has been called the "[f]irst and foremost" of standing's three elements. *Spokeo, Inc*., 136 S. Ct. at 1547 (quoting *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 103 (1998)). In *Spokeo,* the Supreme Court discussed the dual requirements of "particularization" and "concreteness" necessary to establish the "injury-in-fact" prong of Article III standing. 136 S.Ct. at 1548. "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Id.* Concreteness, meanwhile, refers to the realness of the injury. *Id.*

Plaintiffs argue that their allegations regarding the Attorney General's supervisory responsibilities regarding enforcement of Alabama laws (Doc. 18, ¶12), together with the very specific public role that they ascribe to him in advising businesses on both Act 2016-18 and the Birmingham ordinance (Doc. # 18, ¶¶ 13- 14), sufficiently show at this stage that the Attorney General has "some connection with enforcement of the provision at issue." (Doc. # 40 at 16). They also contend that the City's actions complying with state law under the terms of Act 2016-18 are a cause of the Plaintiffs' loss of wages coerced by the challenged statute. By complying with the Act, Plaintiffs argue, the City of Birmingham effectively "enforces" it and therefore has "some connection with the enforcement of the provision at issue." (*Id.*). Defendants respond that it is employers and the Alabama courts -- *i.e.,* parties not before this court -- who will decide whether the Act 2016-18 controls the wages payable to employees in the City of Birmingham. (Doc. # 43 at 8).

In *San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121 (9th Cir. 1996), the Ninth Circuit denied standing to plaintiffs who alleged, among other things, that the Crime Control Act, which banned certain types of guns (but "grandfathered" in certain others) made the guns and ammunition the plaintiffs wished to purchase more expensive. *Id*. at 1124–30. Even assuming that the law restricted supply and that the purported economic injury was an "injury in fact," the *Reno* court found it to be a "fatal flaw" in the plaintiff's standing argument that "nothing in the Act directs manufacturers or dealers to raise the price of regulated weapons." *Id*. at 1130. Rather, third parties such as weapon dealers and manufacturers broke the chain of causation by independently charging higher prices. *Id*. (citing *Lujan*, 504 U.S. at 560). There is a similar "fatal flaw" in Plaintiffs' standing argument here. To be sure, nothing prohibits employers from paying the minimum wage set forth in the city's ordinance (or more than the federal minimum wage). *Reno*, 98 F.3d at 1130.  What the Alabama Legislature has decreed is that a municipality may not *require* a different minimum wage than that sanctioned by federal law.  There is no plausible allegation here that implicates the Attorney General or the City Defendants with respect to any injury in fact suffered by Plaintiffs.

### 2.    Element Two: Traceability

But even if Plaintiffs could establish an injury in fact here, they still lack standing because they cannot meet the second standing element – traceability.  In *Allen v. Wright*, 468 U.S. 737 (1984), the Supreme Court acknowledged that a certain group of plaintiffs, who were parents of black schoolchildren, had indeed stated an injury in fact (*i.e.,* a diminished chance for their children to receive a racially integrated education) but nevertheless found that the injury was not "fairly traceable" to the government's actions they challenged (*i.e.*, granting tax-exempt status to racially discriminatory public schools). *Id*. at 753, 756–58. Rather, the Supreme Court

held that the causal link between the plaintiffs' injury and defendant's actions was "highly indirect" and "attenuated at best" because the injury "'*results from the independent action of some third party not before the court*.'" *Id*. at 757 (quoting *Simon v. Eastern Ky. Welfare Rights Org*., 426 U.S. 26, 42 (1976)) (emphasis added). That is, the Court found the allegation that had the schools not been given tax-exempt status, white students would have attended public rather than private schools was wholly "speculative" *Id*. at 758.

"Cases after *Allen* have held that when a plaintiff is not the direct subject of government action, but rather when the asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, satisfying standing requirements will be 'substantially more difficult.'" *Frank Krasner Enterprises, Ltd. v. Montgomery Cty., MD*, 401 F.3d 230, 234 (4th Cir. 2005) (quoting *Lujan*, 504 U.S. at 562 (in turn quoting *Allen*, 468 U.S. at 758) (internal punctuation and citations omitted))). "This is so because, '[t]he existence of one or more of the essential elements of standing "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict."'" *Frank Krasner Enterprises, Ltd.*, 401 F.3d at 234 (quoting *Allen*, 468 U.S. at 758 (in turn quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (opinion of Kennedy, J.))). This rationale is fatal to Plaintiffs' standing arguments. The parties who are responsible for the passage of Act 2016-18 (which Plaintiffs contend delimited their wages) are not before this court.

### 3.    Element Three: Redressability

Defendants argue that another crucial defect in Plaintiffs' standing argument is that the Act 2016-18 will be in force regardless of any action this court may order Defendant Strange or the City Defendants to undertake.  The court agrees.  "Nothing the Attorney General could be

ordered to do or refrain from doing would redress the injuries [Plaintiffs] allege[]." *Doe v. Pryor*, 344 F.3d 1282, 1286 (11th Cir. 2003) (citing *Hope Clinic v. Ryan*, 249 F.3d 603, 605–06 (7th Cir.2001) (holding that the plaintiffs did not have standing to challenge state laws authorizing private suits for damages where only the state attorney general is named in the suit because "[the state attorney general] cannot cause the plaintiffs injury by enforcing the private-action statutes [and] any potential dispute plaintiffs may have with future private plaintiffs could not be redressed by an injunction running only against public prosecutors")).   Where a defendant occupies a position having no duty at all with regard to an Act, he cannot not be properly made a party to a claim challenging the Act.  *Ex parte Young*, 209 U.S. 123, 158 (1908).

The case of *Fernandez v. Brock*, 840 F.2d 622 (9th Cir. 1988), is instructive.  As a subsequent Ninth Circuit panel (in a later opinion) observed, in *Fernandez*:

> plaintiffs were migrant workers seeking a court order to force the Secretary of Labor to establish regulations that might affect their eligibility for retirement benefits. However, because any increase in the benefits for which plaintiffs would be eligible was entirely contingent upon the actual content of the regulations the Secretary would ultimately establish, *as well as the actions of plaintiffs' private employer*, the court could not say with any degree of confidence that granting the plaintiffs their requested relief would benefit them.

*Alaska Ctr. for the Env't v. Browner*, 20 F.3d 981, 985 (9th Cir.1994) (citing *Fernandez*, 840 F.2d at 626–28) (emphasis added).[3]

Similarly, here, as a matter of law and logic, nothing this court could order Attorney General Strange or the City Defendants to do will affect Plaintiffs' wages. Plaintiffs' employers set those wages, and it is the courts who will determine whether there is any violation of law with respect to the setting of those wages.   Therefore, Plaintiffs have failed to establish the

---

[3] The *Fernandez* court ultimately held that the plaintiffs had standing as a result of a "procedural injury" that existed apart from any reduction in benefits, and that would be redressed by requiring the Secretary to establish the desired regulations. *Fernandez*, 840 F.2d at 631.

requisite elements of Article III standing as to Attorney General Strange and the City Defendants in this case.

At oral argument, the court posed this question:  who would be a proper defendant in this action?  Other than possibly Plaintiffs' current employers, the answer is quite obvious that the body which most directly "caused" Plaintiffs' alleged injury by enacting Act 2016-18, is the Alabama Legislature.  But, notably, this case does not involve a claim against the Alabama Legislature, and with good reason. Members of the legislature are entitled to absolute immunity from the types of claims asserted by Plaintiffs. "Legislative immunity has long been a fixture of our constitutional system. 'The privilege of legislators to be free from arrest or civil process for what they do or say in legislative proceedings has taproots in the Parliamentary struggles of the Sixteenth and Seventeenth Centuries.'" *Freedom from Religion Found., Inc. v. Saccone*, 894 F. Supp. 2d 573, 582 (M.D. Pa. 2012) (quoting *Tenney v. Brandhove*, 341 U.S. 367, 372 (1951). In *Tenney*, the Supreme Court held that state legislators are immune from suit under § 1983 when "acting in the sphere of legitimate legislative activity." *Id*. at 376–77; *see also Bogan v. Scott–Harris*, 523 U.S. 44, 48–49 (1998) (explaining that "legislators were entitled to absolute immunity from suit at common law and that Congress did not intend the general language of § 1983 to impinge on a tradition so well grounded in history and reason") (internal citation and quotations omitted).

The relief sought in the Amended Complaint includes a request for injunctive relief directing the Attorney General to notify legislators and members of the public that the Act 2016-18 violates Section 2 of the VRA and the Thirteenth, Fourteenth and Fifteenth Amendments to the US Constitution[4], and ordering the City of Birmingham and Mayor Bell to enforce Ordinance 16-28.   These actions, according to Plaintiffs, would redress the wrongs caused by the

---

[4] For the reasons discussed below, however, the court finds that the Act does not violate these provisions.

enforcement of 2016-18.   Despite Plaintiffs' creative attempts to plead around legislative immunity, Plaintiffs simply do not have Article III standing to pursue these claims against the Attorney General or the City Defendants.

### C.      The Voting Rights Act (Count I) is Not Implicated Here

Even if Plaintiffs' had Article III standing (and, to be clear, they do not), there is an alternative reason to dismiss the claim asserted in Count I: the conduct alleged in the Amended Complaint simply does not implicate Section 2 of the Voting Rights Act.  That section bans "all States and their political subdivisions from maintaining any voting 'standard, practice, or procedure' that 'results in a denial or abridgement of the right ... to vote on account of race or color.'" *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 479 (1997) (quoting 42 U.S .C. § 1973(a) (emphasis omitted)). Section 2 "does not deal with every voting standard, practice, or procedure, but rather is limited to voting procedures that deny someone the right to vote." *Dougherty Cnty., Ga., Bd. of Ed. v. White*, 439 U.S. 32, 50 n. 4, (1978). To prevail, a plaintiff must demonstrate that "based on the totality of the circumstances, ... the political processes leading to ... election ... are not equally open to participation by [minority groups] ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C.A. §10301  (formerly 42 U.S.C. §1973(b)).

In *Presley v. Etowah County Commission*, the Supreme Court examined the scope of the phrase "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting" found in Section 5 of the Voting Rights Act. 502 U.S. 491 (1992).  Although the *Presley* decision addressed the scope of Section 5 of the Voting Rights Act, its analysis applies with equal force to Section 2 because the same phrase is embodied in both sections: "voting qualification or prerequisite to voting, or standard, practice, or procedure" with respect to voting. *Compare* 42 U.S.C. § 1973(a) *with* 42 U.S.C. § 1973c.  *See Morse v. Republican Party of*

*Va.*, 517 U.S. 186, 209 (1996) (Stevens, J.) ("[C]hanges in practices within covered jurisdictions that would be potentially objectionable under § 2 are also covered under § 5."); *Holder v. Hall*, 512 U.S. 874, 882 (1994) (Kennedy, J.) ("[T]he coverage of §§ 2 and 5 is presumed to be the same."); *Bonilla v. City Council of City of Chi.*, 809 F.Supp. 590, 596 n. 3 (N.D. Ill. 1992) (noting that "[a]lthough *Presley* technically dealt with the scope of § 5 ..., it is equally applicable to § 2 because *Presley* defined the key terms in both sections").

This court has previously adopted the following summary of the *Presley* decision, authored by Chief Judge Watkins of the Middle District of Alabama:

> In *Presley*, the Supreme Court held that § 5 applies only to a change in a "standard practice or procedure" that has a "direct relation to, or impact on, voting." 502 U.S. at 506. The Court observed that it had recognized four types of changes that meet the "direct relation" test: Those that (1) "involved the manner of voting"; (2) "involve[d] candidacy requirements and qualifications"; (3) "concerned changes in the composition of the electorate that may vote for candidates for a given office" or (4) "affect[ed] the creation or abolition of an elective office." *Id.* at 502-03. "The first three categories involve changes in election procedures, while all the examples within the fourth category might be termed substantive changes as to which offices are elective." *Id.* at 503. *Presley* distinguished between changes in a standard, practice, or procedure directly affecting voting by the electorate and "changes in the routine organization and functioning of government." *Id.* at 504. While the latter changes may indirectly affect voting, they are not within the scope of § 5.
>
> The *Presley* plaintiffs argued that a transfer of duties among and away from elected officials pertaining to repairs and discretionary spending for road maintenance within two Alabama county commissions constituted "changes" that had a direct relation to voting and, thus, required preclearance. *See id.* at 493. The first alleged change took away the commissioners' discretion to allocate funds as needed in their districts and instead put all funds in a common account to be doled out based upon needs of the county as a whole. The second alleged change, which occurred within another county commission, transferred authority concerning road and bridge operations from the elected county commissioners to an appointed county engineer who answered to the commission. *See id.* at 497–99.
>
> The Supreme Court held that these changes did not fit within any of the four categories it had previously recognized as having a direct relation to voting. *See id.* at 503-08. The first alleged § 5 change "concern[ed] the internal operations of an elected body." *Id.* at 503. "Changes which affect only the

distribution of power among officials are not subject to § 5 because such changes have no direct relation to, or impact on, voting." *Id.* at 506. The other alleged § 5 change also did not require preclearance because even if "the delegation of authority to an appointed official is similar to the replacement of an elected official with an appointed one" (fourth category), it did not "change[ ] an elective office to an appointive one." *Id.* at 506-07. Both before and after the change, the county voters could elect their county commissioners. And while the change resulted in a shift in the balance of authority through the creation of an appointed post, the commission "retain[ed] substantial authority, including the power to appoint the county engineer and to set his or her budget." *Id.* at 508. The Supreme Court concluded:

> Covered changes must bear a direct relation to voting itself. That direct relation is absent in both cases now before us. The changes in [the two county commissions] affected only the allocation of power among governmental officials. They had no impact on the substantive question whether a particular office would be elective or the procedural question how an election would be conducted. Neither change involves a new "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting." 42 U.S.C. § 1973c.

*Id.* at 510.

*Barber v. Bice,* 44 F. Supp. 3d 1182 (N.D. Ala. 2014) *(*quoting *Ford v. Strange*, 2013 WL 6804191, at *12-13 (M.D. Ala. Dec. 23, 2013), *aff'd*, 580 F. App'x 701 (11th Cir. 2014)). Similarly, here, there is no question that Act 2016-18 does not involve a new "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting." 42 U.S.C. § 1973c.  Both before and after the Act, the Birmingham City voters were free to elect their city councilors. And while the Act may have resulted in a tangential shift in the balance of authority with regard to the setting of wages, the Birmingham City Council has nevertheless "retain[ed] substantial authority."

In *Ford,* city and county officials commenced an action against the Governor and the Attorney General for the State of Alabama claiming that State's elimination of gambling operations was a violation of their rights under the Voting Rights Act and constituted a violation

of their due process rights. 580 F. App'x at 709–10.   In addressing Plaintiffs' claims, the Eleventh Circuit stated:

> *Plaintiffs have not alleged injury to any cognizable "voting rights" for the simple reason that their "asserted basis for standing has nothing to do with voting."* Abortion Rights Mobilization Inc. v. Baker (In re U.S. Catholic Conference), 885 F.2d 1020, 1028 (2d Cir.1989). Plaintiffs allege that Defendants undermined Amendment 744 several years after Plaintiffs had supported it. To the extent that Plaintiffs assert a "voting right" to the post-enactment enforcement of the laws that they vote for, their claims are "wholly insubstantial and frivolous." *Section 2 of the Voting Rights Act protects a right to equal-opportunity participation in the electoral process*. *See Thornburg v. Gingles*, 478 U.S. 30, 47, 106 S.Ct. 2752, 2764, 92 L.Ed.2d 25 (1986) ("The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."). We find no authority for the proposition that it purports to protect a voter's interest in the post-enactment enforcement of the laws that he supports. *See, e.g.*, 42 U.S.C. § 1973l (c)(1) (defining the words "vote" and "voting"). We consequently affirm the district court's dismissal of Count Two on jurisdictional grounds.

*Ford*, 580 F. App'x at 709–10 (emphasis added).   The Eleventh Circuit further held that "the connection between Defendants' alleged conduct and Plaintiffs' votes -- which were cast years earlier -- is simply too tenuous to establish "injury in fact" to any voting rights protected by either Section 2 of the Voting Rights Act or the Thirteenth, Fourteenth, or Fifteenth Amendments to the United States Constitution." *Id.*

Here, too, the operative votes electing Plaintiffs' local and statewide representatives were cast before the passage of the city ordinance and the Act.   Any connection between Defendants' conduct (which had nothing to do with the enactment of Act 2016-18), and their non-enforcement of Birmingham's ordinance, is simply too tenuous to establish an injury in fact to any voting rights.   That is, even if the States' Eleventh Amendment immunity had been abrogated with respect to a Section 2 claim, the "VRA § 2 does not apply, because this is not a case involving a voting qualification or prerequisite to voting or standard, practice, or procedure

resulting in the denial of a right to vote." *Phillips v. Snyder*, 2016 WL 4728026, at *9 (6th Cir. Sept. 12, 2016).

Nor does the passage of Act 2016-18 touch, concern, or even relate to any of the recognized categories to which the VRA applies. *See Presley*, 502 U.S. at 506. Plaintiffs have not alleged any action by Defendants that (1) "involved the manner of voting"; (2) "involve[d] candidacy requirements and qualifications"; (3) "concerned changes in the composition of the electorate that may vote for candidates for a given office" or (4) "affect[ed] the creation or abolition of an elective office." *Id.* at 502-03. At most, the Act 2016-18 removes one thimble-size slice of local authority. There is no colorable assertion that passage of Act 2016-18 has had (or will have) any impact whatsoever on Plaintiffs' right to vote or cast an effective ballot. Under *Presley*, reallocations of government authority do not have the requisite relation to voting on which to base a VRA claim. *Presley*, 502 U.S. at 506. Plaintiffs' Section 2 claim in Count I is due to be dismissed.

### D. Sovereign Immunity Bars Plaintiffs Claim under Section 2 of the VRA (Count I)

Even if Plaintiffs had Article III standing (and they do not), and even if Plaintiffs' claim was cognizable under Section 2 of the Voting Rights Act (and, again, it is not), their claims against the Attorney General and the State are still barred by the doctrine of Sovereign Immunity. A federal court's jurisdiction is limited "to the power conferred by the Constitution and federal statutes, and the party invoking the court's jurisdiction bears the burden of proving the existence of federal jurisdiction." *Lichtenberg v. Sec'y of the Navy*, 627 F. App'x 916, 917 (11th Cir. 2015) (citing *Bishop v. Reno*, 210 F.3d 1295, 1298 (11th Cir. 2000)). The Eleventh Amendment deprives federal courts of the power to hear claims brought by parties against states, their agencies, or their officers, unless the state has waived its immunity or Congress has

abrogated the state's immunity. U.S. Const. amend. XI.

Plaintiffs have not alleged any facts establishing that Alabama's sovereign immunity has been waived.  A waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4 (1969).  The Supreme Court has rejected a finding of a waiver of Eleventh Amendment immunity based on a general statement allowing suit against the state, even when the statement was coupled with an express agreement to obey a specific federal law. *Florida Dep't of Health and Rehabilitative Services v. Florida Nursing Home Ass'n*, 450 U.S. 147, 149–50 (1981) (per curiam) (statute allowing a state to "be sued" and promising to "abide by ... the Title XIX Medicaid Program" did not waive the state's immunity).

Therefore, the fundamental question becomes whether Congress abrogated the state's immunity in enacting the VRA.  The standard for finding a valid abrogation is "stringent." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 56 (1996) (internal quotation marks omitted). And even where Congress has the power to abrogate state immunity (such as in this case here, when it has legislated under the Fourteenth and Fifteenth Amendments), it may do so "only by making its intention unmistakably clear in the language of the statute." *Id*.  So, while Congress certainly had the power to abrogate state immunity when it passed the VRA, the key question is this: did it unmistakably make clear its intent to do so?  The court concludes that it did not.

In reviewing the relevant portions of the VRA, the court cannot discern any implied, let alone unequivocally expressed, abrogation of sovereign immunity. Notably, when private plaintiffs sue under Section 2 of the VRA, they do so only through an "implied private right of action." *See, e.g., Ford v. Strange*, 580 Fed. App'x at 705 n.6 (citing *Morse v. Republican Party of Va.*, 517 U.S. 186 (1996)).  That is, the statute is silent not only as to the abrogation issue, but also as to whether it creates a private right of action. When statutory text is silent on the issue of

whether it abrogates sovereign immunity, that text is ambiguous. *See Williams v. Poarch Band of Creek Indians*, 839 F.3d 1312, 1321 (11th Cir. 2016). And ambiguity cuts no abrogation ice at all. "'To be effective the expression of Congressional intent [to abrogate sovereign immunity] must be a clarion call of clarity. *Ambiguity is the enemy of abrogation*.'" *Williams*, 839 F.3d at 1321 (quoting *Freemanville Water Systems v. Poarch Band of Creek Indians*, 563 F.3d 1205 (11th Cir. 2009)) (emphasis added). There simply is no "clarion call of clarity" found in Section 2's language which signals an abrogation of sovereign immunity. *Id.*

The court acknowledges that at least three courts have found that Congress has abrogated state sovereign immunity for claims arising under Section 2 of the Voting Rights Act. *See Mixon v. State of Ohio*, 193 F.3d 389, 398–99 (6th Cir. 1999); *Reaves v. United States DOJ*, 355 F.Supp.2d 510, 515 (D. D.C. 2005); and *Terrebonne Par. NAACP v. Jindal*, 154 F. Supp. 3d 354, 359 (M.D. La. 2015). But none of these decisions is binding on this court and they are not at all persuasive. *Terrebonne* relied on *Mixon* with little or no examination or analysis of that decision. 154 F. Supp. 3d at 359. And in *Mixon*, the Sixth Circuit's discussion of whether Congress had employed language abrogating states' immunity to these actions consisted of a single paragraph that did not even mention that the plaintiffs were proceeding under an *implied* right of action. *Mixon*, 193 F.3d at 398. Moreover, in *Mixon*, "the Ohio Attorney General ha[d] not [even] pressed the immunity question on appeal." 193 F.3d at 397. And *Reaves* addressed claims under Section 5 of the Voting Rights Act. *Reaves*, 355 F. Supp. 2d at 513. None of these decisions explains why Congress has unmistakably made clear that it was abrogating states' immunity.

But, even more importantly, each of the three decisions got it wrong not only because they failed to apply the stringent analysis (the proper standard required by *Seminole Tribe*, 517 U.S. at 56), but also because the application of such an analysis makes clear that Congress has

not spoken on the issue of abrogation.   For illustration's sake, an example of an express

abrogation of sovereign immunity is found in Title IX.  Title IX explicitly states, "[a] state shall

not be immune under the Eleventh Amendment of the Constitution of the United States from suit

in Federal court for a violation of ... title IX." 42 U.S.C. § 2000d-7(a)(1).  Title IX was enacted

in 1972.  So, it is readily apparent that, in 1972 and since, Congress knew precisely how to

clearly and unmistakably announce the abrogation of sovereign immunity in this manner. The

VRA has been amended a number of times since 1972, yet Congress has never added language

to the Act indicating a clear intention to abrogate states' sovereign immunity. In light of this

silence, this court is constrained by binding precedent to hold that the State Defendants'

immunity was not abrogated with respect to any implied private right of action under Section 2

of the VRA.  *Williams*, 839 F.3d at 1321; *see Ford*, 580 Fed. App'x at 705 n.6.

### E.    Plaintiffs Have Not Adequately Alleged Any Equal Protection Violation (Counts II, VI and VIII)

The Fourteenth Amendment to the United States Constitution provides, in pertinent part:

"No State shall make or enforce any law which shall ... deny to any person within its jurisdiction

the equal protection of the laws." U.S. Const. amend XIV, § 1. This clause is commonly referred

to as the equal protection clause and "is essentially a direction that all persons similarly situated

should be treated alike." *Alamo Rent–A–Car, Inc. v. Sarasota–Manatee Airport Auth*., 825 F.2d

367, 369 (11th Cir. 1987).  Equal protection claims arise from an individual's right not to be

subjected to intentional discrimination at the hands of the government. *Campbell v. Rainbow

City, Ala*., 434 F.3d 1306, 1313-14 (11th Cir. 2006).

Where, as here, the claim is based on a facially neutral statute, an allegation of intentional

discrimination is required. *E & T Realty v. Strickland*, 830 F.3d 1107, 11014 (11th Cir. 1987)

("The requirement of intentional discrimination prevents plaintiffs from bootstrapping all

misapplications of state law into equal protection claims."); *see Etherton v. City of Rainsville*, 2016 WL 5349206, at *4 (11th Cir. Sept. 26, 2016). Indeed, Plaintiffs seemingly conceded that allegations of intentional discrimination are required to state an equal protection claim when they state that Count I of the Amended Complaint under the VRA "is the one claim that does not require proof of racially discriminatory intent." (Doc. # 40 at 25-26).

Plaintiffs' Amended Complaint makes a conclusory allegation, unsupported by any specific factual allegations, that "Defendants actions constitute intentional discrimination on the basis of race." (Doc. # 18 at ¶ 135). But an equal protection claim is not plausible where there is an "obvious alternative explanation" for the conduct other than intentional discrimination. *Jabary v. City of Allen*, 547 F. App'x 600, 605 (5th Cir. 2013) (citing *Twombly*, 550 U.S. at 567). In such a circumstance, a plaintiff must "allege more by way of factual content to 'nudge' his claim of purposeful discrimination 'across the line from conceivable to plausible.'" *Iqbal*, 556 U.S. at 683 (quoting *Twombly*, 550 U.S. at 570). Without specific factual allegations of an intent to discriminate on the part of any particular legislators, Plaintiffs' equal protection claims fail.

In light of the controlling *Twombly*/*Iqbal* standard, and the requirement that a Plaintiff allege intentional discrimination, Plaintiffs' allegations regarding vestiges of *de jure* discrimination fail to 'nudge' their claim equal protection claims across the line from conceivable to plausible. Therefore, these claims are due to be dismissed for this alternative reason.

### F.      Plaintiffs Have Conceded their Privileges and Immunities Claim (Count III)

Plaintiffs have expressly conceded that their claim under the Fourteenth Amendment's Privileges or Immunities Clause (Count III) is foreclosed by Supreme Court precedent. (Doc. # 40 at 53 ("the right to vote is not among the privileges or immunities of United States citizenship

protected by Section 1 of the Fourteenth Amendment. *Minor v. Happersett*, 88 U.S. 162 (1874)."). Therefore, Count III is due to be dismissed for this alternative reason.

### G.  The Fifteenth Amendment is Not Implicated (Count IV)

In Count IV, Plaintiffs assert a claim based on Alabama's alleged *de jure* policy of maintaining white control over local black majorities under of the Fifteenth Amendment.  That assertion lacks merit.

The Fifteenth Amendment provides that a citizen's right "to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1. This claim is due to be dismissed for the same reasons that Plaintiffs' claim under the Voting Rights Act fails — "the connection between Defendants' alleged conduct and Plaintiffs' votes -- which were cast years earlier -- is simply too tenuous to establish 'injury in fact' to any voting rights protected by either section 2 of the Voting Rights Act or the [] Fifteenth Amendment[] … ." *Ford v. Strange*, 580 F. App'x at 710.  *See also Osburn v. Cox*, 369 F.3d 1283, 1288 (11th Cir. 2004) (affirming dismissal of Fifteenth Amendment claim where plaintiffs did not allege that they were denied any fundamental right in relation to voting). Therefore, Plaintiffs' Fifteenth Amendment claim is due to be dismissed for this alternative reason.

### H.  The Thirteenth Amendment is Not Implicated (Count V)

Plaintiff's claim under the Thirteenth Amendment advanced in Count V of the pleadings is similarly without merit.  The Thirteenth Amendment prohibits both slavery and involuntary servitude, except as punishment for a crime when an individual has been duly convicted. U.S. Const., amend. XIII, § 1. The Thirteenth Amendment reaches only slavery or involuntary servitude. Whatever may be otherwise said about their allegations in this case, Plaintiffs have not

claimed that they were forced into slavery or involuntary servitude. Plaintiffs are still entitled to be paid for the work they choose to perform at an amount at least equal to the federal minimum wage, and employers are of course free to pay them more. Therefore, Plaintiffs' Thirteenth Amendment claim is without merit and is due to be dismissed for this alternative reason.

## I.      Intentional Race Discrimination (Count VII)

As an initial matter, because in their Count VII Plaintiffs assert multiple claims, it constitutes an example of "shotgun" style pleading which has been "repeatedly condemned" by the Eleventh Circuit. *See PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V.*, 598 F.3d 802, 806 n. 4 (11th Cir. 2010); *Davis v. Coca-Cola Bottling Co. Consol.,* 516 F.3d 955, 979 (11th Cir. 2008). Indeed, the Eleventh Circuit has stated that such pleadings "wreak havoc on the judicial system" and "divert already stretched judicial resources into disputes that are not structurally prepared to use those resources efficiently." *Wagner v. First Horizon Pharma. Corp.*, 464 F.3d 1273, 1279 (11th Cir. 2006); *see also Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996) (stating that multiple claims should be presented separately in adherence to Federal Rule of Civil Procedure 10(b)). But that is not the only defect that plagues the allegations in this count.

Substantively, this count fails to present anything other than conclusory allegations. Plaintiffs have made no specific factual assertions which indicate that Act 2016-18 has a discriminatory effect. On its very face, the Act applies statewide, prohibiting "[a]ny [local] ordinance, policy, rule, or other mandate" that is inconsistent with its prescribed, uniform minimum wage. Ala. Act No. 2016-18, § 2(b); *see also id.* § 6(d). "Absent discriminatory effect, judicial inquiry into legislative motivation is unnecessary, as well as undesirable." *Crawford v.*

*Bd. of Educ. of City of L.A.*, 458 U.S. 527, 544 n.31 (1982) (citation omitted) (equal protection case).

Where, as here, there are legitimate reasons supporting the legislature's decision, "only the clearest proof [of illicit motive] will suffice." *Smith v. Doe*, 538 U.S. 84, 92 (2003) (quotation marks omitted); *accord Flemming v. Nestor*, 363 U.S. 603, 617 (1960) (requiring clearest-proof requirement); *see also McCleskey v. Kemp*, 481 U.S. 279, 298-99 (1987) (requiring judicial deference in the face of legitimate legislative reasons). Because there are no specific factual allegations to support these conclusory, shotgun allegations, the claims asserted in Count VII are due to be dismissed for this alternative reason.

### J.      Political Process Doctrine (Count IX)

Under the so-called political process doctrine, states may not alter the procedures of government to target racial minorities. *Schuette v. Coal. to Defend Affirmative Action, Integration & Immigrant Rights & Fight for Equal. By Any Means Necessary (BAMN)*, 134 S. Ct. 1623 (2014) (citing *Hunter v. Erickson*, 393 U.S. 385, 394 (1969) (Harlan, J. concurring)). The traditional equal protection analysis focuses on discriminatory intent. The political process doctrine, on the other hand, looks at the discriminatory results of government restructuring. The continued vitality of the political process doctrine as a whole is in question, s*ee Schuette*, 134 S. Ct. at 1653-54 (Sotomayor, J., dissenting); *Romer v. Evans*, 517 U.S. 620, 23-24, 632 (1996); however, that is not the dispositive point here.

Plaintiffs argue that the "political process" doctrine applies to "facially neutral" legislation that restructures the political process. They contend that the court needs a factual record to decide whether the effect of the legislation particularly burdened or injured racial minorities by restructuring the political process and unduly restricting their ability to enact

policies addressing racial disparities in employment.  They further allege that Act 2016-18 suppresses black citizens' economic opportunities.  And they argue that the election of African Americans to county legislative delegations has forced the Legislature to make changes to preserve white control over local governments.

Because Act 2016-18 is facially neutral, it will be subject to strict scrutiny review "only if it can be proved that the law was 'motivated by a racial purpose or object,' or is unexplainable on grounds other than race." *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999).  Even in the view of the dissent in *Schuette*, there is no violation unless the challenged government action "has a racial focus, targeting a policy or program that 'inures primarily to the benefit of the [racial] minority.'" *Schuette*, 134 S. Ct. at 1659 (Sotomayor, J., dissenting) (quoting *Washington v. Seattle Sch. Dist*. No. 1, 458 U.S. 457, 472 (1982) (emphasis added)).

Here, the Act has no racial classifications and, on its face, calls for uniform economic policy throughout the state.  Plaintiffs' political process claim makes nothing more than conclusory allegations, not supported by any alleged factual information, that the Act places a special burden on racial minorities.  Thus, even to the extent the political process doctrine has continuing vitality (an issue this court need not decide here), the allegations of Plaintiffs' Amended Complaint fail to state such a claim.  Therefore, Plaintiffs' political process claim is without merit and is due to be dismissed for this alternative reason.

## IV.    Conclusion

For all these reasons, the court concludes that Plaintiffs' claims are due to be dismissed and Defendants are entitled to judgment as a matter of law. A separate order will be entered.

**DONE** and **ORDERED** this January 31, 2017.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE